171 A.3d 620

DEBRA DUGAN, ALAN FOX, AND ROBERT CAMERON ON BE-
HALF OF THEMSELVES AND ALL OTHERS SIMILARLY SIT-
UATED, PLAINTIFFS-APPELLANTS, v. TGI FRIDAYS, INC.,
CARLSON RESTAURANTS WORLDWIDE, INC., ON BEHALF
OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,
DEFENDANTS-RESPONDENTS. ERNEST BOZZI, ON BEHALF
OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,
PLAINTIFF-RESPONDENT, v. OSI RESTAURANT PARTNERS,
LLC, T/A CARRABBA'S ITALIAN GRILL, ET AL., DEFEN-
DANTS-APPELLANTS.

A–92 Sept.Term 2015

A–93 Sept.Term 2015

077567 and 077556

Argued April 4, 2017—Decided October 4, 2017

32

Sander D. Friedman argued the cause for appellants in Dugan v. TGI Fridays, Inc., (A–92–15) (Law Office of Sander D. Friedman, attorneys; Sander D. Friedman and Wesley G. Hanna, on the briefs).

Stephen M. Orlofsky argued the cause for respondents in Dugan v. TGI Fridays, Inc., (A–92–15) (Blank Rome and LeClair Ryan, attorneys; Stephen M. Orlofsky, David C. Kistler, Jeffrey L. O'Hara, and Matthew S. Schultz, of counsel and on the briefs).

David G. McMillin argued the cause for amicus curiae Legal Services of New Jersey in Dugan v. TGI Fridays, Inc. (A–92–15) (Legal Services of New Jersey, attorneys; Melville D. Miller, Jr. and David G. McMillin on the brief).

Michael A. Galpern argued the cause for amicus curiae New Jersey Association for Justice in Dugan v. TGI Fridays, Inc. (A–92–15) (Locks Law Firm, attorneys; Michael A. Galpern, Andrew P. Bell, and James A. Barry on the brief).

Jeffrey S. Jacobson argued the cause for amicus curiae New Jersey Civil Justice Institute in Dugan v. TGI Fridays, Inc., (A–92–15) (Lowenstein Sandler and Kelley Drye & Warren, attorneys; Jeffrey S. Jacobson and Gavin J. Rooney on the brief).

Stephen M. Orlofsky argued the cause for appellants in Bozzi v. OSI Restaurant Partners, LLC (A–93–15) (Blank Rome and Briggs Law Office, attorneys; Stephen M. Orlofsky, David C. Kistler, Michael A. Iannucci, Norman W. Briggs, and Adrienne Chapman, of counsel and on the briefs).

Donald M. Doherty, Jr. argued the cause for respondent in Bozzi v. OSI Restaurant Partners, LLC (A–93–15) (Law Office of Donald M. Doherty, attorneys; Donald M. Doherty, Jr. on the brief).

Jonathan Romberg argued the cause for amicus curiae Seton Hall University School of Law Center for Social Justice in Dugan v. TGI Fridays, Inc. (A–92–15) and Bozzi v. OSI Restaurant Partners, LLC (A–93–15) (Seton Hall University School of Law Center for Social Justice, attorneys; Jonathan Romberg on the briefs).

David R. Kott argued the cause for amicus curiae New Jersey Business & Industry Association in Dugan v. TGI Fridays, Inc. (A–92–15) and Bozzi v. OSI Restaurant Partners, LLC (A–93–15) (McCarter & English, attorneys; David R. Kott, Edward J. Fanning, Zane C. Riester, and Elizabeth K. Monahan, of counsel and on the briefs).

JUSTICE PATTERSON delivered the opinion of the Court.

In these consolidated appeals, the plaintiffs allege that the defendant operators of New Jersey restaurants engaged in unlawful practices with respect to the disclosure of prices charged to customers for alcoholic and non-alcoholic beverages. Based upon different theories of ascertainable loss and causation, plaintiffs in the two actions demand damages and other relief against defendants under the Consumer Fraud Act (CFA), N.J.S.A. 56:8–1 to –206. They also seek damages, civil penalties, and other relief under the Truth in Consumer Contract, Warranty and Notice Act (TCCWNA), N.J.S.A. 56:12–14 to –18.

In each case, the trial court certified the action as a class action pursuant to Rules 4:32–1 and 4:32–2. In Dugan v. TGI Fridays, Inc., 445 N.J.Super. 59, 135 A.3d 1003 (App. Div. 2016), an Appellate Division panel reversed the trial court's certification of a class. The Appellate Division denied the defendant's motion for leave to appeal in Bozzi v. OSI Restaurant Partners, LLC. We granted leave to appeal in both actions.

Applying the class action certification standard of Rule 4:32–1 to the CFA claim asserted in Dugan v. TGI Fridays, Inc., we hold that plaintiffs have failed to show that common questions of law and fact predominate over individual issues, as Rule 4:32–1 requires. As an alternative to presenting proof of ascertainable loss and causation as to each member of the class, the Dugan plaintiffs propose to demonstrate, for a class numbering in the millions, that TGIF charged each member of the class $1.72 more than the "fair" or "reasonable" prices that it would have charged had it disclosed its beverage prices on the menu. Because our CFA class action jurisprudence rejects "price-inflation" theories, such as the theory presented by the Dugan plaintiffs, as incompatible with the CFA's terms, we conclude that the Dugan plaintiffs have not established predominance with respect to their CFA claims. We accordingly modify and affirm the Appellate Division's determination that the Dugan class was improperly certified for purposes of

the CFA claims asserted in that action and remand for a determination of the individual plaintiffs' CFA claims.

We reach a different conclusion with respect to the CFA claims asserted by plaintiff Ernest Bozzi in Bozzi v. OSI Restaurant Partners, LLC. Although Bozzi asserts general claims that the defendant restaurants failed to disclose prices, his allegations focus primarily on a specific pricing practice. He alleges that the defendant restaurants violated the CFA by increasing the price charged to a customer for the same brand, type, and volume of beverage in the course of the customer's visit to the restaurant, without notifying the customer of the change. Bozzi's counsel represents that this price-shifting claim is supported by claimant-specific receipts showing that each customer making this claim was charged different prices for the same brand, type, and volume of beverage in the course of a single visit to one of the defendant's restaurants.

We hold that if the Bozzi class is redefined to include only customers who make that specific CFA claim, and the claim is limited accordingly, plaintiff Bozzi has met the requirements of Rule 4:32–1 and may attempt to prove that claim on behalf of the class. We modify and affirm the trial court's determination as to the CFA claim in Bozzi and remand for the certification of a class that is limited accordingly.

With respect to the claims based on the TCCWNA in both appeals, we conclude that plaintiffs have failed to satisfy the predominance requirement of Rule 4:32–1. We therefore reverse the trial courts' class certification determinations in both cases with respect to those claims and remand for a determination of plaintiffs' individual TCCWNA claims.

I.

We base our summary of the factual allegations and procedural history of each action on the complaints and the class certification record presented to the trial court in each case.

## A.

In the first of the two putative class actions, Dugan v. TGI Fridays, Inc., plaintiffs Debra Dugan and Alan Fox (Dugan plaintiffs) assert claims against defendants TGI Fridays, Inc. and Carlson Restaurants, Inc.,[1] (collectively, TGIF), owners and operators of TGIF restaurants in New Jersey.

The Dugan plaintiffs claim that TGIF maintained a practice of offering certain beverages in New Jersey TGIF restaurants' menus without listing the prices of those beverages.[2] They allege that TGIF violated the CFA by engaging in unconscionable commercial practices contrary to N.J.S.A. 56:8-2. They also assert, among other claims, that TGIF violated a regulatory provision, N.J.S.A. 56:8-2.5, by selling, attempting to sell, or offering for sale "merchandise that is not price marked at the point of purchase." The Dugan plaintiffs premise their claim under the TCCWNA on the allegation that TGIF violated a "clearly established legal right of a consumer or responsibility of a seller" by offering beverages for sale "without notifying the consumer of the total selling price at the point of purchase." (citing N.J.S.A. 56:12-15; N.J.S.A. 56:8-2.5). The Dugan plaintiffs demand damages, civil penalties, and other relief under the TCCWNA.

In the Dugan plaintiffs' original complaint, Dugan was the sole plaintiff and representative of the putative class. Dugan asserted that, during visits to a company-owned TGIF restaurant in Mount Laurel, she purchased "unpriced soft drinks, mixed drinks, and beer off Defendants' otherwise comprehensively priced menus." Dugan alleged that on each visit she was not made aware of the

---

[1] Carlson Restaurants Worldwide, Inc., which was named as a defendant, is the former name of Carlson Restaurants, Inc.

[2] The Dugan plaintiffs alleged there were thirty-eight TGIF restaurants in New Jersey. TGIF's answers to interrogatories indicated that there were thirty-four TGIF restaurants in New Jersey, twenty that were company-owned and fourteen that were operated as franchises. In their complaint, the Dugan plaintiffs alleged that TGIF controls the content of the menus in all TGIF restaurants, whether those restaurants are company-owned or franchises.

prices charged for the beverages until TGIF staff presented her with a check. In her original complaint, she claimed that during a visit to a TGIF restaurant she was charged $2.00 for a beer at the bar and later charged $3.59 for the same brand of beer after moving to a table.

Dugan alleged that her claims were typical of the claims of the class and asserted that she met all of the requirements for class certification under Rule 4:32–1. She sought certification of a class consisting of "all customers of New Jersey TGI Friday's who purchased items from the menu that did not have a disclosed price."

TGIF moved before the trial court to dismiss Dugan's complaint for failure to state a claim pursuant to Rule 4:6–2(e). The trial court denied the motion to dismiss. An Appellate Division panel denied TGIF's motion for leave to appeal. We granted TGIF's motion for leave to appeal and summarily remanded the matter to an Appellate Division panel for consideration of the merits of the appeal. In an unpublished opinion, the panel concluded that Dugan had adequately pled her CFA and TCCWNA claims and affirmed the trial court's determination. Dugan then filed a first amended complaint, expanding her allegations regarding her visits to the TGIF restaurant in Mount Laurel.

The parties conducted class certification discovery. In her deposition, Dugan admitted that during the 2008 visit to a TGIF restaurant in which she paid different prices for two orders of identical beverages at the bar and at the table, she did not read the beverage section of the menu. She stated that she did not realize until she later reviewed her receipt that she had paid $2.00 for a beer at the bar and later paid $3.59 for a beer at a table. Dugan later submitted a certification stating that she had looked at the TGIF menu on many occasions and expected to pay the same price at the bar that she paid when she sat at a table.

Among the documents produced by TGIF in discovery were documents characterized by the Dugan plaintiffs as training mate-

rials for TGIF servers. Those documents stated that servers seating customers should hand opened menus to customers.

TGIF also produced what the Dugan plaintiffs characterize as "market research." Plaintiffs' counsel stated at oral argument that those documents reflect a TGIF consultant's analysis of consumer behavior in the ordering of beverages in restaurants. The Dugan plaintiffs contend that the market research demonstrates customers' tendency to order less expensive or fewer beverages if beverage prices are listed on the menu than they order if the prices are unlisted. As the research is described by the Dugan plaintiffs, one group of customers studied was informed of beverage prices when visiting a restaurant and the other group was not. The customers informed of beverage prices spent an average of $1.72 less per visit than the customers to whom the prices were not disclosed. Relying on the marketing research, the Dugan plaintiffs claim that TGIF is in a position to charge a higher price for a beverage than the price that it would be compelled by market forces to charge if it were to disclose its beverage prices on restaurant menus.

On that basis, the Dugan plaintiffs stated their intention to prove that each member of their putative class suffered the same ascertainable loss of $1.72 as a result of unconscionable commercial practices and regulatory violations committed by TGIF. They indicated that they would use the $1.72 figure to calculate global damages for their entire class.

Relying on that theory of classwide proof of ascertainable loss and causation, Dugan moved for class certification.[3] Between the filing and the determination of that motion, Dugan filed a second amended complaint, further detailing her allegations about her visits to the TGIF restaurant, omitting references to the specific prices that TGIF charged her, and naming Fox as an additional

---

[3] TGIF cross-moved for summary judgment, which was denied by the trial court.

plaintiff and class representative.[4] Fox described visits to TGIF restaurants and alleged that he would have ordered different or fewer beverages during one of those visits had he been informed about the prices that would be charged.

The trial court concluded that the Dugan plaintiffs had satisfied the requirements of Rule 4:32-1 and granted their motion for class certification. The court included in the class definition all persons who visited a company-owned TGIF restaurant "from January 12, 2004 to June 18, 2014, relied upon [TGIF]'s menu, and purchased an offered but unpriced soda, beer or mixed drink." The court later granted the Dugan plaintiffs' motion to expand the class definition for purposes of providing notice to the class. As expanded, the class defined by the trial court consisted of "[a]ll persons who visited a [TGIF] restaurant in New Jersey that is owned by [TGIF] (i.e. company owned store) from January 12, 2004 to July 14, 2014, and purchased an offered but unpriced soda, beer or mixed drink."[5]

After the trial court denied its motion for reconsideration and/or to decertify the class, TGIF filed a motion for leave to appeal class certification and to stay class notice pending appeal. An Appellate Division panel denied the motions. TGIF moved before this Court for leave to appeal and for a stay. This Court granted leave to appeal, stayed class notice and further proceedings before the trial court, and remanded the matter to the Appellate Division for consideration of the merits of the appeal.

---

[4] The second amended complaint also included claims asserted by a third class representative plaintiff, Robert Cameron, whose allegations related to a visit to a franchise-owned TGIF restaurant. After excluding customers who exclusively visited franchise TGIF restaurants, the trial court dismissed Cameron's claims.

[5] TGIF represents that the company retained to provide notice to the class certified by the trial court estimated that the class consists of thirteen to fourteen million members. The Dugan plaintiffs state that the number of class members may be substantially less than that estimate, as the estimate may reflect individual customers' repeat visits to TGIF restaurants.

An Appellate Division panel reversed the trial court's class certification determination. Dugan v. TGI Fridays, Inc., 445 N.J.Super. 59, 79, 135 A.3d 1003 (App. Div. 2016).[6] The panel concluded that the Dugan plaintiffs had failed to meet Rule 4:32-1's requirement "that common issues of fact as to ... TGIF's customers who purchased unpriced soda, beer or mixed drinks predominate over issues that pertain to individual class members." Id. at 74, 135 A.3d 1003. The panel held that the trial court had improperly included in the class definition all persons who purchased an unpriced soda, beer, or mixed drink "regardless of whether they reviewed the menu before purchasing the beverages" and had therefore included in the class customers who could not establish an ascertainable loss as a result of unlawful conduct, as the CFA requires. Ibid.

The panel also determined that the Dugan plaintiffs had failed to establish predominance under Rule 4:32-1 with respect to their TCCWNA claims. Id. at 77-79. The panel noted the need for "[i]ndividualized inquiries ... to determine whether each class member was handed a menu that lacked beverage pricing" and to assess actual damages under N.J.S.A. 56:12-17. Id. at 79. Given its finding on the issue of predominance, the panel did not reach Rule 4:32-1's other class certification requirements.

We granted the Dugan plaintiffs' motion for leave to appeal. 226 N.J. 543, 145 A.3d 1084 (2016). We also granted the motions of Legal Services of New Jersey, the New Jersey Association for Justice, the Seton Hall University School of Law Center for Social Justice, the New Jersey Civil Justice Institute, and the New Jersey Business and Industry Association to appear as amici curiae.

---

[6] The panel noted that the Dugan plaintiffs filed a motion for leave to file a cross-appeal, challenging the trial court's limitations on the scope of the class. Dugan, supra, 445 N.J.Super. at 70-71, 135 A.3d 1003. In light of its class certification decision, the panel did not reach the cross-appeal.

## B.

The second appeal before the Court arose from another putative class action, Bozzi v. OSI Restaurant Partners, LLC. The action was filed by plaintiff Bozzi against OSI Restaurant Partners, LLC (OSI), an entity that, according to plaintiffs, maintains control of Carrabba's Italian Grill (Carrabba's) restaurants in New Jersey. In his initial complaint, Bozzi asserted claims based solely on the pricing practices of OSI's Carrabba's restaurants. In his amended complaint, Bozzi expanded his claim to include other New Jersey restaurants that OSI has allegedly owned, controlled, and operated, including Outback Steakhouse, Bonefish Grill, Fleming's Prime Steakhouse and Wine Bar, and Cheeseburger in Paradise restaurants.

In his amended complaint, Bozzi asserted a CFA regulatory violation claim based on OSI's alleged contravention of N.J.S.A. 56:8–2.5 and a more general CFA claim based on OSI's alleged practice of "intentionally mislead[ing] customers through stealth price adjustments." He alleged an ascertainable loss under the CFA based on a contention that customers who are uninformed about beverage prices pay higher prices and are "depriv[ed] . . . of their legitimate expectation of an objectively reasonable price." Bozzi sought an injunction, treble damages, and other relief under the CFA, and a judgment declaring that he satisfied the requirements of his CFA claim, pursuant to the Declaratory Judgment Act, N.J.S.A. 2A:16–53. He also pled a claim under the TCCWNA, based on OSI's claimed violation of N.J.S.A. 56:8–2.5, and sought damages and civil penalties under that statute.

Although Bozzi relied on the same statutes cited by the Dugan plaintiffs, he focused more narrowly on OSI's alleged practice of increasing the prices of beverages in the course of a customer's visit without disclosing that change to the customer. Bozzi's individual factual allegations relate primarily to a 2010 visit to a Carrabba's restaurant in Maple Shade. He asserts that, during that visit, neither the restaurant's menu nor any placards or displays disclosed drink prices and that there were no signs,

notices, or displays indicating that there was a discount on drink prices in effect. He asserts that he ordered two Peroni beers during his meal and discovered when he received his check that the first beer cost $3.25, and the second cost $4.25. According to Bozzi, he protested the pricing disparity to a restaurant staff member, who told him that "the computer changes the price at certain times" and that it was the restaurant's policy to charge customers accordingly.

Bozzi moved before the trial court for certification of a class pursuant to Rule 4:32-1. Although Bozzi had proposed, in his initial complaint, a subclass limited to "persons who were charged different prices for the same drinks during a trip to the Defendants' establishment," he sought certification of a broader class of customers who visited an OSI restaurant and purchased a beverage offered on the menu or table placard without a price. Bozzi's counsel represented to the trial court that the expansive class definition was necessary for his TCCWNA claim, which was premised on the general allegation that OSI failed to disclose beverage prices on its restaurants' menus. He advised the trial court that for purposes of the CFA, the claimed ascertainable loss was a "price differential loss," based on OSI's alleged practice of charging different prices for the same beverage on the same visit. Counsel did not explain to the trial court how he intended to prove ascertainable loss and causation on a classwide basis. He acknowledged that he expected a later challenge to his claim that OSI's alleged practice of charging different prices for the same beverage gave rise to a CFA violation.

The trial court granted Bozzi's motion for class certification. The court defined the class to include "[a]ll persons who: (a) visited any OSI Restaurant Partners, LLC or Bloomin' Brands, Inc.,[7] restaurant in New Jersey, from 12/23/04 to the present date; and (b) purchased an item offered on the menu or table

---

[7] The record does not reveal Bloomin' Brands Inc.'s relationship to OSI, or its alleged role in the conduct at issue.

placards for which no price was disclosed on the menu or table placard."

The trial court also granted Bozzi's motion for injunctive relief. It ordered OSI to "list all prices in the menus for all items contained in their menus," and to "list prices for any items displayed on a table placard or similar display available to customers," within ten days. The court granted a stay of proceedings before it, including the injunction, in anticipation of OSI's motion for leave to appeal its orders.

OSI moved before the Appellate Division for leave to appeal. An Appellate Division panel denied that motion and denied OSI's motion for reconsideration.

We granted OSI's motion for leave to appeal. 226 N.J. 543, 145 A.3d 1084 (2016). We also granted the motions of the Seton Hall University School of Law Center for Social Justice and the New Jersey Business and Industry Association to appear as amici curiae.

## II.

### A.

In Dugan v. TGI Fridays, Inc., plaintiffs argue that the Appellate Division panel's decision diverged from this Court's class certification jurisprudence, which endorses the class action device as a method of resolving disputes between plaintiffs with small claims for damages and institutional defendants. The Dugan plaintiffs argue that although there are individualized questions that must be resolved to determine their claims, common questions of law and fact predominate. They contend that they can prove their CFA and TCCWNA claims for the class as a whole because TGIF subjected all customers to a price-gouging strategy, and they need not present proofs of each customer's interaction with the server or motivation in purchasing a beverage. The Dugan plaintiffs argue that damages can be calculated for the class as a whole

using the same methodology as would apply to assess damages in an individual plaintiff's ordinary bad faith contract case.

TGIF contends that the Appellate Division panel properly reversed the trial court's grant of class certification. It maintains that the Dugan plaintiffs cannot prove that the class members suffered an ascertainable loss as a result of the allegedly offending practices, as required by N.J.S.A. 56:8–19, without demonstrating that loss for each individual claimant in a class estimated to involve thirteen to fourteen million beverage purchases. TGIF contends that to establish a claim under the TCCWNA, each class member would be required to prove that he or she was given a menu, and to individually prove damages, and that common questions of law and fact do not predominate over individual questions as to the TCCWNA.

## B.

In Bozzi v. OSI Restaurant Partners, LLC, OSI asks the Court to reverse the trial court's grant of class certification. OSI contends that, in finding that common questions predominate over individual issues in the resolution of plaintiffs' CFA claim, the trial court ignored the requirement that plaintiffs prove that OSI's conduct caused an ascertainable loss in order to prevail under N.J.S.A. 56:8–19. It argues that Bozzi's claim is predicated solely on OSI's alleged "secret shift" of beverage prices and that Bozzi's individual theory of ascertainable loss and causation diverges from the theory that applies to other members of the class. OSI asserts that to establish liability under the TCCWNA each claimant must show that he or she was provided with a menu that violated the law and consequently sustained damages and that the necessity of individual determinations of the TCCWNA claims precludes effective management of a class action in this case. Finally, OSI argues that the trial court should not have granted injunctive relief.

Bozzi contends that the Court should construe N.J.S.A. 56:8–2.5 to mandate that restaurants post prices for beverages on menus or placards and inform consumers if prices change. He proposes

three alternative class definitions: (1) an expansive class asserting a TCCWNA claim, consisting of all customers who visited an OSI restaurant and were presented with a menu; (2) a more limited class, asserting a CFA claim, consisting of all customers who purchased an unpriced beverage at an OSI restaurant; and (3) the narrowest class, asserting a CFA claim, consisting of customers who paid different prices for the same beverage during a visit to an OSI restaurant. Bozzi represents that to prove ascertainable loss for members of the latter class, he intends to rely on receipts showing that customers paid different prices for the same beverage during the same restaurant visit.

## C.

Amicus curiae Legal Services of New Jersey contends that class certification is essential to the vindication of low-income consumers' small claims. It asserts that the Dugan plaintiffs met the predominance requirement of Rule 4:32-1 because the CFA does not require reliance, that the omission of prices from TGIF menus gave rise to an inference of causation for purposes of the CFA, and that the offering of menus without beverage prices satisfied the "provision" requirement of the TCCWNA.

Amicus curiae New Jersey Association for Justice contends that the practices of TGIF in Dugan generally violate the CFA and the TCCWNA, thus satisfying the predominance requirement of Rule 4:32-1 for purposes of the liability claim, and that distinctions among the damages claims of class members should not defeat class certification in that case.

Amicus curiae Seton Hall University School of Law Center for Social Justice contends that because of TGIF's alleged practice of not including drink prices on the menu and the marketing research disclosed in discovery, the Dugan plaintiffs are in a position to present collective proof of ascertainable loss and causation. It contends that the entire class may demonstrate ascertainable loss based on the difference between the price that TGIF charged and the price that it would have charged had it not instituted a pricing

scheme, or, alternatively, based on the difference between the price charged and a reasonable price. Seton Hall University School of Law Center for Social Justice argues, in both Dugan and Bozzi, that the plaintiffs' TCCWNA claims are even more appropriate for classwide resolution than their CFA claims because the TCCWNA does not require proof of ascertainable loss or causation.

Amicus curiae New Jersey Civil Justice Institute argues that a court should never certify a class action to pursue a claim under the TCCWNA unless there is evidence that, at a minimum, all class members received and reviewed the allegedly offending contract. It contends that the TCCWNA contemplates individual litigation and that the prospect of a civil penalty and an award of attorneys' fees under the TCCWNA provides a sufficient incentive for aggrieved consumers to bring individual actions.

Amicus curiae New Jersey Business and Industry Association urges the Court to adopt a rule barring class certification for the litigation of TCCWNA claims. It contends that the TCCWNA's civil penalty provisions provide ample incentives for individual litigation and that those provisions are unduly punitive when imposed on behalf of a large class of claimants.

### III.

A "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Iliadis v. Wal–Mart Stores, Inc., 191 N.J. 88, 103, 922 A.2d 710 (2007) (quoting Califano v. Yamasaki, 442 U.S. 682, 700–01, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176, 192 (1979)). The class action device "furthers numerous practical purposes, including judicial economy, cost-effectiveness, convenience, consistent treatment of class members, protection of defendants from inconsistent obligations, and allocation of litigation costs among numerous, similarly-situated litigants." Id. at 104, 922 A.2d 710. In light of those objectives, our courts have "consistently held that the class action rule should be liberally construed." Lee v. Carter–Reed Co.,

203 N.J. 496, 518, 4 A.3d 561 (2010) (quoting Iliadis, supra, 191 N.J. at 103, 922 A.2d 710).

Pursuant to our court rules, a trial court considering a putative class action "shall, at an early practicable time, determine by order whether to certify the action as a class action," and, if certification is granted, enter an order defining "the class and the class claims, issues or defenses" and appointing class counsel. R. 4:32–2(a).

█ Rule 4:32–1 prescribes the standard for the determination of a motion to certify a class. Subsection (a) of that Rule imposes four initial requirements, frequently termed "numerosity, commonality, typicality and adequacy of representation," in order for a class to be certified. Lee, supra, 203 N.J. at 519, 4 A.3d 561 (citing In re Cadillac V8–6–4 Class Action, 93 N.J. 412, 424–25, 461 A.2d 736 (1983)). The Rule provides:

(a) General Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

[R. 4:32–1(a).]

If the plaintiff satisfies Rule 4:32–1(a)'s requirements, the court then considers the standard of Rule 4:32–1(b)(3):

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of paragraph (a) are satisfied, and in addition:

. . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability in concentrating the litigation of the claims in the particular forum; and

(D) the difficulties likely to be encountered in the management of a class action.

To determine predominance under Rule 4:32–1(b)(3), the court decides "whether the proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" Iliadis, supra, 191 N.J. at 108, 922 A.2d 710 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 2249, 138 L.Ed.2d 689, 712 (1997)). Rule 4:32–1(b)(3) does not demand a showing "that there is an 'absence of individual issues or that the common issues dispose of the entire dispute,' or 'that all issues [are] identical among class members or that each class member [is] affected in precisely the same manner.'" Lee, supra, 203 N.J. at 520, 4 A.3d 561 (alterations in original) (quoting Iliadis, supra, 191 N.J. at 108–09, 922 A.2d 710). Nor must a plaintiff demonstrate that the number of common issues exceeds the number of individual issues. Varacallo v. Mass. Mut. Life Ins. Co., 332 N.J.Super. 31, 45, 752 A.2d 807 (App. Div. 2000).

The predominance factor, however, is "'far more demanding' than Rule 4:32–1(a)(2)'s requirement that there be questions of law or fact common to the class." Castro v. NYT Television, 384 N.J.Super. 601, 608, 895 A.2d 1173 (App. Div. 2006) (quoting Amchem Prods., supra, 521 U.S. at 624, 117 S.Ct. at 2250, 138 L.Ed.2d at 713). As the Court observed in Lee, supra, the predominance requirement mandates "a qualitative assessment of the common and individual questions rather than a mere mathematical quantification of whether there are more of one than the other." 203 N.J. at 519–20, 4 A.3d 561 (citing Iliadis, supra, 191 N.J. at 108, 922 A.2d 710). As the Court has observed, "the answer to the issue of predominance is found ... in a close analysis of the facts and law." Iliadis, supra, 191 N.J. at 109, 922 A.2d 710 (alteration in original) (quoting Cadillac, supra, 93 N.J. at 434, 461 A.2d 736). The Court has stressed the importance of such an analysis in the context of a CFA class action, rejecting the contention that the identity of a defendant's conduct toward each plaintiff class member obviates the need for a searching inquiry into each plaintiff's particular response to that identical conduct.

Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc., 192 N.J. 372, 390–91, 929 A.2d 1076 (2007).

 A class action plaintiff must also demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." R. 4:32–1(b)(3). A court analyzing that factor must undertake "(1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of the fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method." Iliadis, supra, 191 N.J. at 114–15, 922 A.2d 710 (quoting Cadillac, supra, 93 N.J. at 436, 461 A.2d 736); see also Int'l Union, supra, 192 N.J. at 383, 929 A.2d 1076 (holding that "superiority" requirement mandates " 'a comparison with alternative procedures' to evaluate both fairness and efficiency of the class action proceeding" (quoting Iliadis, supra, 191 N.J. at 114, 922 A.2d 710)).

 In determining a motion for class certification, a court "must 'accept as true all of the allegations in the complaint,' and consider the remaining pleadings, discovery (including interrogatory answers, relevant documents, and depositions), and any other pertinent evidence in a light favorable to plaintiff." Lee, supra, 203 N.J. at 505, 4 A.3d 561 (quoting Int'l Union, supra, 192 N.J. at 376, 929 A.2d 1076); accord Iliadis, supra, 191 N.J. at 96, 922 A.2d 710.

 The deferential standard by which the court views the facts alleged, however, does not apply to a plaintiff's assertion that a given case is appropriate for class certification. To the contrary, a court deciding class certification "must undertake a 'rigorous analysis' to determine if the Rule's requirements have been satisfied." Iliadis, supra, 191 N.J. at 106–07, 922 A.2d 710 (quoting Carroll v. Cellco P'ship, 313 N.J.Super. 488, 495, 713 A.2d 509 (App. Div. 1998)). "That scrutiny requires courts to look 'beyond the pleadings [to] . . . understand the claims, defenses, relevant facts, and applicable substantive law.' " Id. at 107 (alteration in

original) (quoting Carroll, supra, 313 N.J. Super. at 495, 713 A.2d 509).

When an order granting or denying class certification is reviewed on appeal, the "appellate court must ascertain whether the trial court has followed" the class action standard set forth in Rule 4:32-1. Lee, supra, 203 N.J. at 506, 4 A.3d 561. In general, an appellate court reviews a trial court's class action determination for abuse of discretion. See Cadillac, supra, 93 N.J. at 438–39, 461 A.2d 736 (determining whether trial court abused its discretion in certifying class); Muise v. GPU, Inc., 371 N.J.Super. 13, 29, 851 A.2d 799 (App. Div. 2004) (reviewing trial court's determination that class certification was not warranted for abuse of discretion); Pressler & Verniero, Current N.J. Court Rules, comment 2.2.3 on R. 4:32-1(b)(3) (2017).

## IV.

### A.

In accordance with Rule 4:32-1 and our case law, we review the trial court's certification of a class for the determination of the CFA claims asserted in each of the two appeals before the Court. As an initial step in that inquiry, we review the substantive law that governs the plaintiffs' CFA claims. See Iliadis, supra, 191 N.J. at 107, 922 A.2d 710 (finding that court determining class certification must analyze claims and defenses); Lee, supra, 203 N.J. at 506, 4 A.3d 561 (noting need to review substantive law).

The CFA was enacted to "provide[ ] relief to consumers from 'fraudulent practices in the market place.'" Lee, supra, 203 N.J. at 521, 4 A.3d 561 (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 11, 860 A.2d 435 (2004)). Originally, the CFA permitted no private right of action; rather, it authorized "the Attorney General to combat the increasingly widespread practice of defrauding the consumer." Cox v. Sears Roebuck & Co., 138 N.J. 2, 14, 647 A.2d 454 (1994) (quoting S. Comm. Statement to S. 199 (1960) (L. 1971, c. 247, § 7)). In 1971, the Legislature amended the

CFA "to permit individual consumers to bring private actions to recover refunds, N.J.S.A. 56:8–2.11 to –2.12, and treble damages for violations, N.J.S.A. 56:8–19." Weinberg v. Sprint Corp., 173 N.J. 233, 248, 801 A.2d 281 (2002) (citing Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264, 696 A.2d 546 (1997); Riley v. New Rapids Carpet Ctr., 61 N.J. 218, 226, 294 A.2d 7 (1972)).

> The CFA's private cause of action is an "efficient mechanism to: (1) compensate the victim for his or her actual loss; (2) punish the wrongdoer through the award of treble damages; and (3) attract competent counsel to counteract the 'community scourge' of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual."
>
> [D'Agostino v. Maldonado, 216 N.J. 168, 183–84, 78 A.3d 527 (2013) (quoting Weinberg, supra, 173 N.J. at 249, 801 A.2d 281).]

N.J.S.A. 56:8–2 expansively defines the conduct that violates the CFA:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[ ] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

An "unlawful practice" contravening the CFA may arise from (1) an affirmative act; (2) a knowing omission; or (3) a violation of an administrative regulation. Thiedemann v. Mercedes–Benz USA, LLC, 183 N.J. 234, 245, 872 A.2d 783 (2005); Cox, supra, 138 N.J. at 17, 647 A.2d 454. A showing of intent is not essential if the claimed CFA violation is an affirmative act or a regulatory violation, but such a showing is necessary if the claimed violation is an omission pursuant to N.J.S.A. 56:8–2. Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 556, 964 A.2d 741 (2009); Gennari v. Weichert Co. Realtors, 148 N.J. 582, 605, 691 A.2d 350 (1997); Cox, supra, 138 N.J. at 17–18, 647 A.2d 454.

In addition to generally alleging unconscionable commercial practices under N.J.S.A. 56:8–2, the Dugan plaintiffs and Bozzi allege that the defendant restaurants committed a regulatory violation by contravening N.J.S.A. 56:8–2.5. Under that section of the CFA, it is an "unlawful practice" "to sell, attempt to sell or

offer for sale any merchandise at retail unless the total selling price of such merchandise is plainly marked by a stamp, tag, label or sign either affixed to the merchandise or located at the point where the merchandise is offered for sale." N.J.S.A. 56:8-2.5; see also In re Johnny Popper, Inc., 413 N.J.Super. 580, 588–89, 997 A.2d 257 (App. Div. 2010) (concurring with Division of Consumer Affairs' determination that used car dealer's practice of listing vehicle prices only on price list in its building, rather than affixing prices to vehicles or listing them near vehicles, violated N.J.S.A. 56:8-2.5). That provision is central to plaintiffs' CFA and TCCWNA claims in these appeals.

To prevail under the CFA, a plaintiff must not only prove "unlawful conduct by defendant," but must also demonstrate "an ascertainable loss by plaintiff" and "a causal relationship between the unlawful conduct and the ascertainable loss." D'Agostino, supra, 216 N.J. at 184, 78 A.3d 527 (quoting Bosland, supra, 197 N.J. at 557, 964 A.2d 741). The statute provides that

> [a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act or practice declared unlawful under this act . . . may bring an action . . . . In any action under this section the court shall, in addition to other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.
>
> [N.J.S.A. 56:8-19.]

Although "the Attorney General does not have to prove that the victim was damaged by the unlawful conduct, a private plaintiff must show that he or she suffered an 'ascertainable loss.'" Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 473, 541 A.2d 1063 (1988) (quoting N.J.S.A. 56:8-2); see also Weinberg, supra, 173 N.J. at 251, 801 A.2d 281 ("[T]he plain language of the Act unmistakably makes a claim of ascertainable loss a prerequisite for a private cause of action . . . ."); Lee, supra, 203 N.J. at 522, 4 A.3d 561 ("To establish causation, a consumer merely needs to demonstrate that he or she suffered an ascertainable loss . . . ."). As this Court has noted, "[t]o raise a genuine dispute about [an ascertainable loss claim], the plaintiff must

proffer evidence of loss that is not hypothetical or illusory." Thiedemann, supra, 183 N.J. at 248, 872 A.2d 783.

N.J.S.A. 56:8–19's causation element—the requirement that plaintiff prove that he or she suffered an ascertainable loss "as a result of" the defendant's unlawful "method, act or practice"—is "not the equivalent of reliance." Lee, supra, 203 N.J. at 522, 4 A.3d 561; accord Gennari, supra, 148 N.J. at 607, 691 A.2d 350. Instead, the CFA requires a showing of "a causal relationship between the unlawful conduct and the ascertainable loss." Bosland, supra, 197 N.J. at 557, 964 A.2d 741; see also N.J. Citizen Action v. Schering–Plough Corp., 367 N.J.Super. 8, 12–13, 842 A.2d 174 (App. Div.), certif. denied, 178 N.J. 249, 837 A.2d 1092 (2003). "The limiting nature of the requirement allows a private cause of action only to those who can demonstrate a loss attributable to conduct made unlawful by the CFA." Thiedemann, supra, 183 N.J. at 246, 872 A.2d 783 (citing Meshinsky, supra, 110 N.J. at 473, 541 A.2d 1063).

The CFA elements of ascertainable loss and causation are the focus of the parties' dispute regarding Rule 4:32–1 predominance in these appeals.

## B.

### 1.

Guided by the statutory language and jurisprudence defining a private cause of action under N.J.S.A. 56:8–19, we review the Appellate Division panel's determination that the Dugan plaintiffs failed to demonstrate predominance under Rule 4:32–1(b)(3) with respect to their CFA claims.

For purposes of our analysis, we assume the truth of the Dugan plaintiffs' allegation that TGIF, prompted by its market research, declined to list prices for its beverages on its menus in order to increase its revenue from beverage sales. See Lee, supra, 203 N.J. at 505, 4 A.3d 561; Iliadis, supra, 191 N.J. at 96, 922 A.2d 710. We also assume the truth of the Dugan plaintiffs' allegation that

during visits to TGIF restaurants, the class members purchased beverages for which prices were not listed on the menus. Ibid. We accept as true for purposes of the appeal the testimony of class representatives Dugan and Fox that, during their visits to TGIF restaurants, they would not have ordered the beverages that they ordered, or they would have ordered fewer or less expensive beverages, had they been informed of the beverage prices. Ibid.

In our "qualitative assessment of the common and individual questions," Lee, supra, 203 N.J. at 519, 4 A.3d 561, we note that plaintiffs' pricing claims are inherently different from the CFA claims in our prior CFA class action case law. Here, plaintiffs do not allege that they purchased defective or deficient goods, as the claimants contended in several of this Court's CFA class certification decisions. See, e.g., id. at 526–28, 4 A.3d 561 (stating that if plaintiffs proved allegations that defendants made false claims about dietary supplement, product is worthless "bottle of broken promises" and each purchase, unless refunded, "is an out-of-pocket loss"); Furst, supra, 182 N.J. at 9, 860 A.2d 435 ("[W]hen a merchant violates the [CFA] by delivering defective goods and then refusing to provide conforming goods, a customer's ascertainable loss is the replacement value of those goods."); Cadillac, supra, 93 N.J. at 434–35, 461 A.2d 736 (concluding that predominance requirement was met by class of claimants who purchased vehicles with allegedly defective engines). The beverages at issue in these appeals were not defective; instead, it appears that those beverages were precisely what the customers ordered. Accordingly, plaintiffs do not contend that they are entitled to a refund of money spent on a worthless or deficient item.

Instead, the Dugan plaintiffs contend that they were charged an excessive price for the alcoholic and non-alcoholic beverages that they purchased at defendants' restaurants. Their predominance claim is complicated by the fact that the products at issue are beverages sold in restaurants at a range of prices and purchased by consumers with divergent motivations, beverage preferences, and budgetary constraints.

The Dugan plaintiffs do not represent that they can present individualized proof that every claimant in their multi-million-member class would have purchased fewer or less expensive beverages, or none at all, had TGIF informed him or her of the beverage prices.[8] Instead, citing breach of contract law, they propose classwide proofs of ascertainable loss and causation. They seek to predicate a uniform finding of ascertainable loss and causation on the difference between what they contend would be "fair" or "reasonable" prices for beverages and the prices that TGIF actually charged. Although TGIF's market research involved only a small number of consumer subjects, plaintiffs seek to extend the results of that research to the beverage purchases of their entire class.[9] The Dugan plaintiffs urge the Court to con-

---

[8] We do not share our dissenting colleague's conclusion that plaintiffs have proven a CFA violation in the Dugan case. See post at 79, 171 A.3d 620 (attributing to TGIF a "cynical corporate policy of profiteering from violating" the CFA); post at 83, 171 A.3d 620 (contending that TGIF maintains a "corporate policy of willful disregard of the CFA"); post at 85, 171 A.3d 620 (citing TGIF's apparent "business decision not to list beverage prices for the sake of higher profits, notwithstanding that its policy violated the CFA"); post at 90, 171 A.3d 620 (citing a "corporate policy of ignoring provisions of the CFA"). TGIF has not stipulated that it violated the CFA. No jury has considered the Dugan plaintiffs' claims, let alone rendered a verdict for plaintiffs. No trial court has entered summary judgment in plaintiffs' favor in the Dugan case. Only a motion to dismiss was denied by the trial court, and that action was affirmed by the Appellate Division. We do not review that determination in these appeals. Our role in this case is to review the trial courts' class certification decisions, not to act as a factfinder with respect to plaintiffs' substantive claims.

[9] The Dugan plaintiffs suggest that a figure set forth in TGIF's marketing research, $1.72, would represent the difference between the average price charged by TGIF for a beverage and a "fair" or "reasonable" price that should have been charged for that beverage, and would therefore be the measure of a class member's ascertainable loss. The Dugan plaintiffs misconstrue the import of the figure of $1.72 that appears in TGIF's marketing research. Based on the limited record on that market research, it does not appear that the $1.72 figure set forth in the research documents related to the price charged for a single beverage. Instead, that figure evidently represented the difference between the average amount of money that the research subject customers, who were not informed about beverage prices, would spend on a given restaurant visit and the

clude, based on that theory of ascertainable loss and damages, that common issues of law and fact predominate over individual issues, as Rule 4:32–1(b)(3) requires.

In some settings in which a contract's price term is undefined, our law authorizes the court to determine what would constitute a reasonable price and calculate damages accordingly. See N.J.S.A. 12A:2–305(1) (stating factors to determine "a reasonable price" when "[t]he parties conclude[d] a contract for sale even though the price [was] not settled"); Wilson v. Amerada Hess Corp., 168 N.J. 236, 240, 254, 773 A.2d 1121 (2001) (remanding to allow more discovery on issue of good faith in case in which price term was left open); Truex v. Ocean Dodge, Inc., 219 N.J.Super. 44, 50–52, 529 A.2d 1017 (App. Div. 1987) (finding lack of price agreement did not indicate lack of contract and remanding for determination of damages).

Those principles, however, cannot simply be extrapolated from a specific contract dispute, in which a court hears evidence of the parties' intent, to a class action CFA claim involving millions of beverage purchases. Significantly, the able counsel for the parties and amici cite no decisions in which a theory analogous to that proposed by the Dugan plaintiffs has been accepted as a method of proving ascertainable loss and causation in a CFA class action. To the contrary, our case law has consistently rejected "price-inflation" theories—closely related to fraud on the market theories—as a substitute for proof of ascertainable loss or causation in CFA claims.

We first considered a "fraud-on-the-market" theory in a class action setting in Kaufman v. i-Stat Corp., 165 N.J. 94, 754 A.2d 1188 (2000). In Kaufman, the plaintiff class allegedly "purchased securities in the secondary markets at attractive prices that had been artificially affected by an issuer's misrepresentations and omissions." Id. at 97, 754 A.2d 1188. The plaintiffs sought to prove

average amount that the research subject customers, who were informed about beverage prices, would spend on a visit.

reliance, an element of their common-law fraud claim, by demonstrating that the defendant's misrepresentations and omissions resulted in an inflated share price that all class members had paid for the securities. Ibid.

Rejecting the Kaufman plaintiffs' fraud-on-the-market theory, we noted that plaintiffs in certain federal securities-fraud class actions may collectively prove reliance based on evidence that the defendant's fraudulent conduct affected the price of the securities at issue. Id. at 103–08, 754 A.2d 1188 (citing Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). We analyzed the extensive federal and state case law and academic research rejecting the fraud-on-the-market theory outside of the securities-fraud context in which the theory arose. Id. at 113–18, 754 A.2d 1188. We concluded that

> [a]ccepting fraud on the market as proof of reliance in a New Jersey common-law fraud action would undercut the public interest in preventing forum-shopping, weaken our law of indirect reliance, and run contrary to the policy direction of the Legislature and Congress. We decline to expand our law regarding satisfaction of the reliance element of a fraud action on the basis of a complex economic theory that has not been satisfactorily proven.
>
> [Id. at 118, 754 A.2d 1188.]

In International Union, supra, we applied that principle in the setting of a CFA claim in which plaintiffs had the burden of proving ascertainable loss and causation, but not reliance. 192 N.J. at 392, 929 A.2d 1076. There, the class representative plaintiff asserted that the putative class of third-party pharmaceutical benefit payors had paid more for the prescription drug Vioxx because the defendant's allegedly fraudulent marketing had driven up the price of the drug. Id. at 390, 929 A.2d 1076. The plaintiffs proposed to prove ascertainable loss and causation for the class as a whole by demonstrating the extent of that price inflation. Id. at 392, 929 A.2d 1076.

Noting that, in Kaufman, a fraud-on-the-market theory was "rejected ... as being inappropriate in any context other than federal securities fraud litigation," we declined to accept, as a method of classwide proof, the plaintiffs' theory "that the price

charged for Vioxx was higher than it should have been as a result of defendant's fraudulent marketing campaign." Ibid. We observed that

> [p]laintiff argues that it should be permitted to demonstrate classwide damages through use of a single expert who would opine about the effect on pricing of the marketing campaign in which defendant engaged. To the extent that plaintiff intends to rely on a single expert to establish a price effect in place of a demonstration of an ascertainable loss or in place of proof of a causal nexus between defendant's acts and the claimed damages, however, plaintiff's proofs would fail. That proof theory would indeed be the equivalent of fraud on the market, a theory we have not extended to CFA claims.
>
> [Id. at 392, 929 A.2d 1076.]

Other courts have similarly rejected class representatives' contentions that ascertainable loss and causation could be proven for a class in a CFA case on the theory that the defendants' unlawful practices enabled them to charge more for the goods sold, affecting every member of the class. In N.J. Citizen Action, supra, the panel affirmed the dismissal of a putative class action in which plaintiffs asserted a "fraud on the market or price inflation theory," based on the allegation that defendant's allegedly fraudulent direct-to-consumer marketing caused class members to pay "artificially inflated prices." 367 N.J.Super. at 12–14, 842 A.2d 174. The court noted that the plaintiffs' theory would effectively eliminate the ascertainable loss and causation requirements that differentiate consumer CFA claims from Attorney General enforcement actions under the statute. Id. at 16, 842 A.2d 174.

In Dabush v. Mercedes–Benz USA, LLC, 378 N.J.Super. 105, 874 A.2d 1110 (App. Div.), certif. denied, 185 N.J. 265, 883 A.2d 1062 (2005), another Appellate Division panel rejected a class plaintiff's theory that all members of the class of lessors had paid an inflated price for a vehicle model's navigation system, and that this inflated price constituted the entire class's ascertainable loss:

> Though couched in different terms, plaintiff advances the same "price-inflation" theory that we rejected in [N.J. Citizen Action]. He claims he paid for the lease of a vehicle that he expected to contain a navigation system that had all roads and highways and, therefore, he must have paid a higher price for the less effective product which did not contain full coverage of every road. Adopting this theory of ascertainable loss would "fundamentally alter the concept of causation in the CFA

context," and would effectively afford private citizens rights that the Legislature has expressly reserved for the Attorney General.

[Id. at 123, 874 A.2d 1110 (quoting N.J. Citizen Action, supra, 367 N.J.Super. at 16, 842 A.2d 174).]

In Fink v. Ricoh Corp., 365 N.J.Super. 520, 537, 545–47, 839 A.2d 942 (Law Div. 2003), the court declined to certify a nation-wide class to pursue CFA and other claims against the manufacturer of a digital camera that was allegedly marketed with misleading promotional materials. The court rejected the plaintiffs' suggestion that they could prove ascertainable loss and causation for all class members—whether or not they had ever viewed the promotional materials—based on the promotional materials' alleged impact on the demand for and price of the camera. Id. at 551–55, 839 A.2d 942. The court noted the lack of case law "approv[ing] the 'price inflation' theory as an accepted means of proving proximate cause or an ascertainable loss under the [CFA] or any comparable consumer fraud statute," and concluded "that the price inflation theory is not relevant to the issue of proximate cause and is too speculative to establish an ascertainable loss." Id. at 554, 839 A.2d 942.

Applying the CFA and its Delaware counterpart, the United States Court of Appeals for the Third Circuit recently rejected a putative class's price-inflation theory of ascertainable loss and causation. In Harnish v. Widener University School of Law, 833 F.3d 298, 309–13 (3d Cir. 2016), the proposed class consisted of law students claiming that they paid higher tuition because of the defendant law school's allegedly misleading graduate employment statistics. Id. at 302. The plaintiffs sought to avoid the necessity of proving the impact of the allegedly false statistics on individual class members' educational choices by arguing that "the misrepresentations empowered [the law school] to charge more across the entire market." Id. at 312.

Affirming the district court's decision not to certify the class, the Third Circuit concluded that the district court had improperly labeled the plaintiff's theory of classwide proof a "fraud-on-the-market" theory and that plaintiffs' contention was more accurately

described as a "price-inflation theory." Id. at 312–13. Citing International Union and other New Jersey and Delaware consumer-fraud case law, the Third Circuit found the distinction "immaterial because the state courts have refused to recognize either theory outside the federal securities fraud context." Id. at 313.

The Dugan plaintiffs similarly seek to predicate a classwide finding of ascertainable loss and causation on a "price-inflation" theory, premised on the contention that TGIF's unlawful pricing practices empowered it to overcharge its customers. They postulate that by virtue of its policy of leaving beverage prices off its menu, TGIF was able to inflate beverage prices across its market without reducing customer demand.

As we determined in International Union and the Third Circuit decided in Harnish, the proposed price-inflation theory does not establish ascertainable loss and causation in this CFA class action case. Individual plaintiffs may be able to establish ascertainable loss and causation by showing that they would not have purchased the beverages or would have spent less money on them had they been informed of their cost. The Dugan plaintiffs cannot establish ascertainable loss and causation, however, by demonstrating that TGIF's beverage prices were higher than they would have been had TGIF listed its prices on its restaurant menus. A "fair" or "reasonable" price derived from the per-visit expenditures of marketing research subjects is no substitute for proof of the actual claimants' ascertainable loss and causation. Plaintiffs' price-inflation theory does not globally establish those elements of the CFA for the vast and varied class of restaurant customers for which the Dugan plaintiffs seek certification.[10]

---

[10] The Dugan plaintiffs suggest that members of the class who cannot establish ascertainable loss and causation can be identified and excluded from the class in the post-verdict claims process. However, plaintiffs' burden is to demonstrate that the class members' CFA claims can be proven with common issues predominating over individual questions of fact and law, and they cannot rely on the post-verdict claims process as a substitute for competent proof in a fair trial. See

Other than to distinguish these appeals from this Court's decision in International Union because the plaintiffs relied on a single expert in that case, post at 43, 171 A.3d 620, our dissenting colleague does not address the authority clearly establishing that plaintiffs' price-inflation theory cannot give rise to classwide proof of ascertainable loss and causation. Int'l Union, supra, 192 N.J. at 391–92, 929 A.2d 1076; N.J. Citizen Action, supra, 367 N.J.Super. at 12–14, 842 A.2d 174; Dabush, supra, 378 N.J.Super. at 123, 874 A.2d 1110; see also Harnish, supra, 833 F.3d at 309–13. Instead, our colleague mischaracterizes our holding as a global rejection of statistical evidence in class actions, thus refuting a proposition that we simply do not assert. Post at 40–42, 171 A.3d 620.

In that regard, our dissenting colleague relies on three decisions: the United States Supreme Court's opinion in Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. ——, ——, 136 S.Ct. 1036, 1046, 194 L.Ed.2d 124, 134–35 (2016), and two federal district court decisions, In re Scotts EZ Seed Litigation, 304 F.R.D. 397 (S.D.N.Y. 2015) and Goldemberg v. Johnson & Johnson Consumer Cos., 317 F.R.D. 374 (S.D.N.Y. 2016). Post at 40–42, 171 A.3d 620. None of those decisions bears the slightest relationship to the issues presented by these appeals.

Tyson Foods was an appeal of a judgment in favor of a class of meat processing plant employees who alleged that the defendant employer violated the Fair Labor Standards Act, 29 U.S.C.A. § 201 to –209, by failing to pay the employees overtime for the time that they spent donning and doffing protective equipment. 577 U.S. at ——, 136 S.Ct. at 1045, 194 L.Ed.2d at 133. Rejecting the defendant's challenge to the jury's verdict, the Supreme Court held that the trial court had properly permitted the plaintiffs to rely on employee testimony, video recordings and an expert's study regarding the average time that "various donning and doffing activities took" in the defendant's plant. Id. at ——, 136

R. 4:32–1(b)(3) (requiring finding that class action is superior method "for the fair and efficient adjudication of the controversy").

S.Ct. at 1043, 194 L.Ed.2d at 132. The plaintiffs' use of fact and expert testimony in Tyson Foods to demonstrate the time consumed by the donning and doffing activities at issue is simply unrelated to the price-inflation theory that the Dugan plaintiffs seek to assert as a classwide substitute for that proof of ascertainable loss and causation that the CFA requires.

The federal district court's decision in Scotts EZ Seed arose in a setting very different from that of Dugan: consumer claims premised on New York and California false advertising law. There, the plaintiffs asserted two contentions against the defendant manufacturer of grass seed advertised as capable of growing grass "50% Thicker with Half the Water": that "nobody was able to grow grass using EZ Seed," and that the plaintiffs had "paid an inappropriate premium for EZ Seed based on Scotts' allegedly false 50% thicker claim." 304 F.R.D. at 408–09. The district court held that the alleged falsity of the contested advertising claim was subject to generalized proof, and that under the governing New York statute harm could be proven classwide based on plaintiffs' alleged purchase of a "worthless product" or payment of a premium "based on the false 50% thicker claim." Id. at 409. The district court construed the California false advertising statute not to require individualized proof of causation "because causation as to each class member is commonly proved more likely than not by [the] materiality" of the false claim. Id. at 410 (quoting Guido v. L'Oreal, USA, Inc., 284 F.R.D. 468, 482 (C.D. Cal. 2012)). Thus, the district court's determination that common issues of fact and law predominated in Scotts EZ Seed derived from the contention that every member of the class was damaged by an economic decision that he or she would not have made but for the false advertising: the purchase of a product alleged to be, at a minimum, incapable of performing as advertised, or entirely worthless. Ibid. That uniform consumer choice—allegedly prompted by a single false advertising claim directly material to the value of the product—stands in stark contrast to the class members' disparate decisions to purchase beverages at restaurants in the Dugan case.

Finally, our dissenting colleague relies on a decision involving alleged mislabeling, Goldemberg, supra, 317 F.R.D. at 385–94. There, the district court applied New York, California and Florida law to the plaintiffs' claims that the defendant's Aveeno products were falsely labeled "Active Naturals®" because they "contain unnatural, synthetic ingredients." Id. at 382. The court premised its class action predominance determination on New York, California, and Florida case law addressing a method of proving damages for all claimants in a false-advertising class: a computation of the "price premium" of mislabeling, measured as "the difference between the cost of the second best product in the product class (without a deceiving label) and the cost of the product at issue (with the label)." Id. at 394. Even under the law of the states at issue in Goldemberg, the "price premium" theory of classwide proof addressed by the district court would have no place in a CFA claim premised on the claimants' purchases of millions of beverages, none of which is alleged to have been mislabeled or falsely advertised. The Goldemberg case is simply irrelevant here.

In short, the decisions cited by our dissenting colleague do not in any respect undermine the authority on which we rely to reject the Dugan plaintiffs' price-inflation claims.

Accordingly, we concur with the Appellate Division panel that the Dugan plaintiffs failed to establish, with respect to their CFA claim, that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." R. 4:32–1(b)(3). We do not reach the question whether the Dugan plaintiffs satisfied the remaining requirements of Rule 4:32–1. We hold that the panel properly reversed the trial court's certification of a class with respect to that claim.

## 2.

We apply the standard of Rule 4:32–1 to the CFA claims asserted in Bozzi v. OSI Restaurant Partners, LLC. For purposes of that inquiry, we assume the truth of Bozzi's allegations regarding OSI's alleged practices and his testimony regarding his bever-

age purchases at an OSI restaurant. See Lee, supra, 203 N.J. at 505, 4 A.3d 561; Iliadis, supra, 191 N.J. at 96, 922 A.2d 710.

■ Before this Court, Bozzi did not assert that he could prove ascertainable loss and causation on behalf of his proposed class through the use of a price-inflation theory such as the theory asserted in Dugan. Instead, he focused on a category of OSI restaurant customers identified as a subclass in his original complaint: customers who, in the course of a single visit to an OSI restaurant, were charged different prices for beverages of the same brand, type, and volume. Bozzi represents that, in discovery, OSI produced receipts documenting the prices paid by each class member who makes the price-shifting claim and that he is therefore in a position to prove that OSI charged each claimant two different prices for the same beverage in a single visit. Bozzi also states that he can demonstrate that class members were unaware that after purchasing a beverage at one price, they would be charged more for a second or subsequent beverage.

For purposes of class certification analysis, we do not determine whether Bozzi's price-shifting allegations, if proven, would give rise to a CFA violation. That claim has not yet been challenged in a motion to dismiss or summary judgment motion, and the merits of that claim are not before the Court in these appeals. Iliadis, supra, 191 N.J. at 107, 922 A.2d 710; Olive v. Graceland Sales Corp., 61 N.J. 182, 189, 293 A.2d 658 (1972). We consider only whether Bozzi's proposed class for purposes of his CFA claim, as limited to customers who ordered more than one beverage on a visit to an OSI restaurant and were charged a higher price for the second or subsequent beverage of the same brand, type, and volume, [11] meets the standard of Rule 4:32–1.

With respect to Bozzi's price-shifting CFA claim, the proposed class satisfies the four requirements of Rule 4:32–1(a). The class

---

[11] The "volume" of a beverage may be measured in ounces, in pints or half-pints, or in other units.

clearly includes numerous claimants.[12] In Bozzi's CFA claim, there are common questions of fact relating to OSI's pricing practices and at least one common question of law—whether increasing the price of a beverage during a customer's restaurant visit without informing the customer constitutes an unlawful practice under N.J.S.A. 56:8–2. When the class's allegations are limited to the price-shifting CFA claim, Bozzi's claim is typical of the claims asserted by the class; supported by a receipt, Bozzi contends that during a 2010 visit to the Carrabba's restaurant in Maple Shade, he was charged two different prices for Peroni beers, the second price higher than the first. Finally, the record indicates that "the representative parties will fairly and adequately protect the interests of the class." R. 4:32–1(a).

As limited, Bozzi's CFA claim also satisfies Rule 4:32–1(b)(3)'s predominance requirement.[13] With the assistance of claimant-specific records, both parties will be in a position to determine the dates and locations of the visits at issue and may be able to identify the reasons for the inconsistent prices. Even if discovery proves that the price disparity alleged by the class derived not from a single corporate policy but from restaurant-specific happy hour or other pricing practices, the trial court may be in a position to evaluate the disputed practices on a restaurant-by-restaurant basis. If plaintiffs prove an unlawful practice under the CFA, the receipts, in combination with other evidence, may support a finding of ascertainable loss and causation. The trial court would clearly be confronted with the task of adjudicating

---

[12] During oral argument, Bozzi's counsel stated that the proposed class consists of two hundred sixty-three thousand OSI restaurant customers. It is unclear whether that estimate applies to the entire class certified by the trial court or to the more limited class of claimants who assert the price-shifting CFA claim.

[13] Bozzi's contention regarding predominance is limited to claimants who can demonstrate that they paid different prices for the same brand, type, and volume of beverage in the same visit to an OSI restaurant. He has not identified any method of proving ascertainable loss and causation for other members of the class certified by the trial court.

individual questions, but the existence of individual questions does not preclude a finding of predominance. See Lee, supra, 203 N.J. at 526–28, 4 A.3d 561 (finding predominance notwithstanding existence of individual questions); Cadillac, supra, 93 N.J. at 430–35, 461 A.2d 736 (same).

 Such a class would also satisfy the requirement that a class action provide a superior method "for the fair and efficient adjudication of the controversy." R. 4:32–1(b)(3); see also Iliadis, supra, 191 N.J. at 114–15, 922 A.2d 710 (noting superiority inquiry involves informed consideration of alternative available methods of adjudication of each issue, comparison of fairness of class action and alternative methods, and comparison of efficiency of each method). Bozzi's price-shifting CFA claim involves modest individual claims that are unlikely to be brought in an alternative forum. See Iliadis, supra, 191 N.J. at 104, 922 A.2d 710 ("[T]he class action's equalization function opens the courthouse doors for those who cannot enter alone."). Those claims would not be efficiently resolved on an individual basis.

Importantly, the certification of the class as limited will not deprive OSI of the opportunity to evaluate and respond to plaintiffs' allegations. Based on Bozzi's representation, it appears that the parties have documents indicating where and when each class member was charged disparate prices for the same brand, type, and volume of beverage on the same restaurant visit. OSI will be in a position to contest plaintiffs' allegations of unlawful practices under the CFA with respect to the prices imposed by individual restaurants at various times. It may argue in a summary judgment motion, and/or at trial, that a given restaurant's beverage pricing or the restaurants' practices as a whole did not violate the CFA. A limited class may be certified without compromising the fairness of the proceeding. Bozzi's proposed CFA class action meets Rule 4:32–1's requirement of superiority.

In sum, Bozzi has met the requirements for class certification with respect to his CFA claim, if the class is limited to claimants who were charged different prices for beverages of the same

brand, type, and volume in the course of the same restaurant visit. We therefore reverse the trial court's class certification order and remand for the certification of a redefined class. See Muise, supra, 371 N.J. Super. at 19, 64, 851 A.2d 799 (affirming trial court's decertification of class and remanding for certification of "more limited ... class of customers [of electrical utility] whose outages directly resulted from the alleged negligence in delaying the replacement of transformers at the [utility's] Red Bank substation").

The trial court should define the class as follows:

All persons who ordered more than one beverage of the same brand, type, and volume during a single visit to an OSI Restaurant Partners, LLC, or Bloomin' Brands, Inc., restaurant in New Jersey from January 23, 2004 to the present date, and were charged a higher price for a second or subsequent beverage of the same brand, type, and volume ordered during the same visit, without notice of the change in prices.

On remand, the trial court should certify the class solely for the purpose of pursuing CFA claims based upon the defendant restaurants' alleged practice of charging a customer different prices for beverages of the same brand, type, and volume during the same restaurant visit.[14]

## V.

### A.

The second statutory claim asserted by the putative classes in both appeals is based on the TCCWNA. That statute was enacted in 1981 "to prevent deceptive practices in consumer contracts." Kent Motor Cars, Inc. v. Reynolds & Reynolds Co.,

---

[14] The trial court should also vacate the injunction, requiring OSI restaurants to include prices for all beverages on its menus, that was entered following its certification of the class based on the claims of that entire class. OSI challenged that injunction in this appeal, and Bozzi offered no argument in support of the trial court's injunctive relief. Following certification of the more limited class set forth above, the trial court may consider any application for injunctive relief made on behalf of that class.

207 N.J. 428, 457, 25 A.3d 1027 (2011). The Legislature observed that

> [f]ar too many consumer contracts, warranties, notices and signs contain provisions which clearly violate the rights of consumers. Even though these provisions are legally invalid or unenforceable, their very inclusion in a contract, warranty, notice or sign deceives a consumer into thinking that they are enforceable, and for this reason the consumer often fails to enforce his rights.
>
> [Sponsor's Statement to A. 1660 2 (1980).]

As the TCCWNA's legislative history reflects, the Legislature "did not recognize any new consumer rights but merely imposed an obligation on sellers to acknowledge clearly established consumer rights and provided remedies for posting or inserting provisions contrary to law." Shelton v. Restaurant.com, Inc., 214 N.J. 419, 432, 70 A.3d 544 (2013) (citing N.J.S.A. 56:12–15 to –16); see also Alloway v. Gen. Marine Indus., L.P., 149 N.J. 620, 641, 695 A.2d 264 (1997) (setting forth purpose and provisions of TCCWNA).

The TCCWNA provides in part:

> No seller, lessor, creditor, lender or bailee shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign after the effective date of this act which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.
>
> [N.J.S.A. 56:12–15.]

The TCCWNA imposes a range of remedies against a defendant who violates the statute:

> Any person who violates the provisions of this act shall be liable to the aggrieved consumer for a civil penalty of not less than $100.00 or for actual damages, or both at the election of the consumer, together with reasonable attorney's fees and court costs. This may be recoverable by the consumer in a civil action in a court of competent jurisdiction or as part of a counterclaim by the consumer against the seller, lessor, creditor, lender or bailee or assignee of any of the aforesaid, who aggrieved him. A consumer also shall have the right to petition the court to terminate a contract which violates the provisions of [N.J.S.A. 56:12–15] and the court in its discretion may void the contract.
>
> [N.J.S.A. 56:12–17.]

Two requirements of the TCCWNA are relevant to the class certification issues raised on these appeals. First, in order to

obtain a remedy under the TCCWNA, a plaintiff must be an "aggrieved consumer"—a consumer who satisfies the elements of the TCCWNA. N.J.S.A. 56:12–17. The TCCWNA defines "consumer" as "any individual who buys, leases, borrows, or bails any money, property or service which is primarily for personal, family or household purposes." N.J.S.A. 56:12–15.

The TCCWNA does not specifically define what makes a "consumer" an "aggrieved consumer" for purposes of N.J.S.A. 56:12–17. In several settings, however, courts have examined the interaction between the parties and the nature of the contract or other writing in order to determine whether a plaintiff is entitled to relief under the TCCWNA. See, e.g., Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 125–26, 85 A.3d 947 (2014) (analyzing TCCWNA claim in case involving nursing home and third-party payment guarantors); Shelton, supra, 214 N.J. at 436–42, 70 A.3d 544 (concluding that TCCWNA applies to transactions between plaintiffs and internet seller of restaurant coupons and certificates based on detailed analysis of transactions); United Consumer Fin. Servs. Co. v. Carbo, 410 N.J.Super. 280, 306, 982 A.2d 7 (App. Div. 2009) (applying TCCWNA when retail installment sales contract contravened provisions of Retail Installment Sales Act); Bosland v. Warnock Dodge, Inc., 396 N.J.Super. 267, 278–79, 933 A.2d 942 (App. Div. 2007) (applying TCCWNA to dealership's registration overcharges), aff'd, 197 N.J. 543, 562, 964 A.2d 741 (2009).

Second, in order to be found liable under the TCCWNA, a defendant must have violated a "clearly established legal right" or "responsibility." N.J.S.A. 56:12–15. To make that determination, courts assess whether the CFA or another consumer protection statute or regulation clearly prohibited the contractual provision or other practice that is the basis for the TCCWNA claim. See, e.g., Mladenov v. Wegmans Food Mkts. Inc., 124 F.Supp.3d 360, 380 (D.N.J. 2015) (holding that plaintiffs who failed to state viable claims under CFA or federal food labeling regulation established no violation of "clearly established legal right" under TCCWNA); United Consumer Fin. Servs., supra, 410 N.J.Super. at 306–07, 982

A.2d 7 (applying TCCWNA based on violation of "clearly established" right under Retail Installment Sales Act, N.J.S.A. 17:16C–50); Bosland, supra, 396 N.J.Super. at 278–80, 933 A.2d 942 (holding that plaintiff presented prima facie proof that defendant dealership that overcharged car buyers for vehicle registration fee in contravention of consumer regulation violated "clearly established" right).

■ The "clearly established" standard accordingly requires a case-specific evaluation whether a "written consumer contract[,] . . . warranty, notice or sign" violates a legal right or responsibility that was "clearly established" by "State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed." N.J.S.A. 56:12–15. That inquiry may give rise to different results, depending on the timing of the offer, contract, or warranty. Ibid.; see, e.g., Mattson v. Aetna Life Ins. Co., 124 F.Supp.3d 381, 393 (D.N.J. 2015) (ruling that plaintiff's asserted statutory right not to be subjected to subrogation claim was not "clearly established" when allegedly offending notices were sent).

### B.

Against that backdrop, we consider whether the trial courts properly applied Rule 4:32–1's predominance requirement when they certified the classes proposed by the Dugan plaintiffs and by Bozzi for adjudication of their respective TCCWNA claims.[15] We do not determine whether a defendant restaurant's presentation of

---

[15] We do not reach the broader issue, raised by amici curiae New Jersey Civil Justice Institute and New Jersey Business and Industry Association but not by any party, whether class certification should ever be granted as a method of adjudicating a TCCWNA claim. See State v. Lazo, 209 N.J. 9, 25, 34 A.3d 1233 (2012) ("As a general rule, an amicus curiae must accept the case before the court as presented by the parties and cannot raise issues not raised by the parties." (quoting Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n, 91 N.J. 38, 48–49, 449 A.2d 1254 (1982))); accord State v. O'Driscoll, 215 N.J. 461, 479, 73 A.3d 496 (2013); State v. Gandhi, 201 N.J. 161, 191, 989 A.2d 256 (2010).

a menu that omits beverage prices gives rise to a TCCWNA claim. In the predominance inquiry, however, we look beyond the pleadings and examine the factual and legal bases of plaintiffs' TCCWNA claim. See Lee, supra, 203 N.J. at 526–28, 4 A.3d 561 (applying predominance standard to CFA claim); Iliadis, supra, 191 N.J. at 107, 922 A.2d 710 (establishing requirements of predominance in class certification analysis); see also In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 310–12 (3d Cir. 2008) (analyzing predominance in context of antitrust case).

■ In these appeals, plaintiffs contend that by failing to list prices for beverages on the menus, the defendant restaurants violated plaintiffs' "clearly established" legal rights and defendants failed to meet their "clearly established" legal responsibilities under N.J.S.A. 56:8–2.5; they contend that the statute required defendants to "plainly mark" the beverages that they sold "by a stamp, tag, label or sign" in the location where the beverages were offered for sale. Plaintiffs assert that when the defendant restaurants' employees presented menus to members of the putative TCCWNA class, they "offer[ed]" contracts that violated N.J.S.A. 56:8–2.5 to those consumers. Plaintiffs seek an award of damages and the imposition of $100 per violation civil penalties on defendants for each alleged TCCWNA violation.

■ We conclude that plaintiffs have not met the predominance requirement of Rule 4:32–1 with respect to their TCCWNA claims in either appeal. First, the requirement that a plaintiff be an "aggrieved consumer" in order to pursue a TCCWNA claim gives rise to a range of individual questions regarding the interaction between the customer and the server in this case. By its very terms, the TCCWNA addresses "contract[s]," "warrant[ies]," "notice[s]," and "sign[s]" and does not apply when a defendant fails to provide the consumer with a required writing. N.J.S.A. 56:12–15; see also Jefferson Loan Co. v. Session, 397 N.J.Super. 520, 540–41, 938 A.2d 169 (App. Div. 2008). Here, the writing on which plaintiffs rely is the restaurant menu. Plaintiffs concede that, at a minimum, a claimant must prove that he or she was presented

with a menu during his or her visit to the defendants' restaurant in order to establish the defendant's liability under the TCCWNA. That critical inquiry cannot be resolved by customer receipts or other documents. Even if we accept plaintiff's theory of liability under the TCCWNA, the testimony of the individual claimant or another witness would be necessary to prove that the plaintiff satisfies the statute's requirements and is thus an "aggrieved consumer."

Contrary to plaintiffs' suggestion, they cannot meet their burden under the TCCWNA by presenting evidence that TGIF servers were instructed to hand menus to customers.[16] The training documents on which plaintiffs rely do not prove that any individual consumer received a menu, much less demonstrate the critical interaction between any single member of the putative class and the allegedly offending menu. Moreover, we do not agree with the Dugan plaintiffs that the post-verdict claims process provides an appropriate forum for determining an element that is essential to liability under the TCCWNA. Under the TCCWNA, plaintiffs have the burden to prove the statute's elements at trial. N.J.S.A. 56:12–15, –17.

Accordingly, a claimant who does not, at a minimum, prove that he or she received a menu cannot satisfy the elements of the TCCWNA and is not an "aggrieved consumer." In that critical

---

[16] Our dissenting colleague contends that plaintiffs are entitled to an inference "that TGIF's servers complied with corporate policy and that patrons received menus." Post at 89, 171 A.3d 620. In the predominance inquiry, we do not simply accept a class plaintiff's contention that an element of their claim can be proven for the class as a whole with a single piece of evidence; instead, we subject that claim and other aspects of the case to a "rigorous analysis." Iliadis, supra, 191 N.J. at 106–07, 922 A.2d 710 (citations omitted). Here, not even plaintiffs contend that an indication in training documents that servers were instructed to hand customers menus is proof of a universal practice; they concede that not all customers received the menu that is the foundation of their TCCWNA claims. TGIF's training documents do not obviate the need for plaintiffs to prove—for each claimant—the contention at the core of their TCCWNA claim: the customers' receipt of a writing that violated that statute. N.J.S.A. 56:12–15.

regard, individual questions would predominate over common is-sues at trial.

Second, the question whether the defendant restaurants violated a "clearly established legal right" or a "clearly established . . . legal responsibility" raises the specter of disparate results for different members of the class. The sole published decision con-struing the source of plaintiffs' asserted "right," N.J.S.A. 56:8–2.5, addresses a used car dealership's sale of vehicles without posting their prices on or near them in the dealership's lot. In re Johnny Popper, Inc., supra, 413 N.J.Super. at 583, 997 A.2d 257. No published opinion holds that N.J.S.A. 56:8–2.5 prohibits restau-rants and other food service businesses from offering food or beverages to customers without listing the prices for those items on their menu. Moreover, as plaintiffs acknowledge, many food-service businesses in New Jersey—ranging in size from corporate chain restaurants to family-owned delicatessens and diners—rou-tinely offer customers food and beverage specials and other items without designating in writing the prices for those items. Although N.J.S.A. 56:8–2.5 has been in effect for several decades, there is no evidence that the Attorney General, charged to enforce the CFA, has ever taken the position that N.J.S.A. 56:8–2.5 requires the prices of all food and beverages served in restaurants to be listed on menus. In short, nothing in the record suggests that N.J.S.A. 56:8–2.5 was previously invoked against the restaurant practices at issue in this case.

The Dugan plaintiffs maintain that even if their legal rights and TGIF's responsibilities under N.J.S.A. 56:8–2.5 were not "clearly established" before they brought their claims, those rights and responsibilities were confirmed when an Appellate Division panel affirmed the trial court's denial of TGIF's motion to dismiss in an unpublished decision. They contend that, in the wake of that decision, N.J.S.A. 56:8–2.5's application to restaurant menus was "clearly established" for purposes of the TCCWNA.

In its 2011 decision, however, the Appellate Division did not hold that TGIF violated the Dugan plaintiffs' "clearly established"

right within the meaning of the TCCWNA. The panel determined only that plaintiff Dugan adequately pled violations of the CFA and the TCCWNA under the lenient standard of Rule 4:6–2(e); it properly noted that "[w]hether [Dugan] can prove any, or all, of that is not before us." Even if that decision could fairly be construed to clearly establish plaintiffs' rights under N.J.S.A. 56:8–2.5, it would not apply to all members of the Dugan plaintiffs' class, which at plaintiffs' request was defined to include claimants who visited restaurants from 2004 to the present. Plaintiffs have not established predominance with respect to that element of their TCCWNA claim.

Moreover, even if a menu lacking beverage prices were to constitute a "contract," "warranty," "notice" or "sign" within the meaning of the TCCWNA, it is far from clear that the statute was intended to apply as plaintiffs contend that it should. As the Dugan plaintiffs concede, if plaintiffs were to prove that each of the thirteen to fourteen million restaurant visits by a member of the plaintiff class gave rise to a TCCWNA violation warranting a civil penalty of $100, TGIF would be liable for penalties amounting to more than a billion dollars. Plaintiffs assert that the court could reduce that penalty by remittitur. See R. 4:49–1; see generally Cuevas v. Wentworth Grp., 226 N.J. 480, 144 A.3d 890 (2016) (clarifying appropriate use of remittitur). Nothing in the legislative history of the TCCWNA, which focuses on sellers' inclusion of legally invalid or unenforceable provisions in consumer contracts, suggests that when the Legislature enacted the statute, it intended to impose billion-dollar penalties on restaurants that serve unpriced food and beverages to customers. See Sponsor's Statement to A. 1660, supra (noting legislative objective to deter sellers from including unlawful provisions in contracts, warranties, notices, and signs).

Accordingly, we hold that in both Dugan v. TGI Fridays Inc. and Bozzi v. OSI Restaurant Partners, LLC, plaintiffs have not met Rule 4:32–1's class certification standard for purposes of the

TCCWNA claims, and that the trial courts improperly granted class certification as to those claims.

## VI.

In Dugan v. TGI Fridays Inc., we affirm and modify the Appellate Division's judgment concerning class certification. We remand the matter to the trial court for the determination of the individual CFA and TCCWNA claims asserted by plaintiffs Dugan and Fox.

In Bozzi v. OSI Restaurant Partners, LLC, we affirm in part and reverse in part the trial court's class certification determination. We remand the matter to the trial court for the certification of a class with a revised class definition, as set forth in this opinion, solely for purposes of plaintiffs' CFA claim based on OSI's alleged price-shifting practice, and for the determination of the individual TCCWNA claim asserted by plaintiff Bozzi.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, FERNANDEZ–VINA, and TIMPONE join in JUSTICE PATTERSON's opinion.

JUSTICE ALBIN filed a separate, dissenting opinion.

JUSTICE SOLOMON did not participate.

JUSTICE ALBIN, dissenting.

Today's decision denying plaintiffs the right to proceed with a class-action lawsuit against TGI Fridays, Inc. and Carlson Restaurants, Inc. (collectively, TGIF) is at odds with decades of this Court's jurisprudence and steepens the path to justice for consumers with small claims. The decision will make it more difficult for a class of many thousands of defrauded consumers to act collectively in pursuit of a common remedy against a corporate wrongdoer.

In knowing violation of the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8–1 to –206, TGIF does not list beverage prices on its menus. TGIF pursues this policy because it knows—through

its own study—that a consumer will pay, on average, $1.72 more per meal if beverage prices are not placed on menus. Plaintiffs allege that TGIF, by not listing beverage prices in violation of N.J.S.A. 56:8–2.5, reaped an illicit benefit while TGIF patrons suffered an ascertainable loss. To be sure, TGIF is free to charge whatever it wishes. But if it does so, it must comply—like all restaurants—with the law.

A single consumer does not have the economic wherewithal to litigate against a corporate giant over a $1.72 claim. However, thousands of similarly defrauded consumers banding together in a class action gain "a measure of equality against" a defiant corporate adversary. Lee v. Carter–Reed Co., 203 N.J. 496, 517–18, 4 A.3d 561 (2010).

Unlike the majority, I believe that plaintiffs have presented a viable legal theory under the CFA and our class-action jurisprudence. Looking at the evidence in the light most favorable to plaintiffs, as we must at this stage, TGIF engaged in an unconscionable commercial practice that caused an ascertainable loss to its patrons. TGIF has calculated that loss to be $1.72 per meal when beverage prices are not listed on menus. TGIF has concluded that uninformed consumers make purchases exceeding the "fair" price they otherwise would have paid. Thus, each class member's ascertainable loss is the difference between what the patron in fact paid and what the patron would have paid had TGIF listed beverage prices at the point of sale, as required by N.J.S.A. 56:8–2.5.

In the setting before us lies a stark reality. There is no reasonable substitute for a class action to vindicate the rights of TGIF's victimized patrons. There will not be individual complaints filed in small claims court to recover a loss of $1.72. The majority's decision to overthrow the trial court's certification of the class ensures that there will be no judicial action holding TGIF accountable for its wrongdoing. The majority also has given TGIF a perverse incentive to continue violating the CFA and an unde-

served advantage over competitor restaurants that comply with our consumer-fraud laws.

I therefore respectfully dissent.

## I.

### A.

Plaintiffs filed a class-action lawsuit against TGIF, alleging that the chain restaurant engaged in a systematic scheme to violate the Consumer Fraud Act in pursuit of higher profits.[1] Plaintiffs claim that TGIF deliberately does not list beverage prices on its menus "to induce[ ] consumers to pay higher than reasonable prices for those beverages." TGIF does not list beverage prices on its menus, notwithstanding N.J.S.A. 56:8–2.5, which requires that the "selling price" of merchandise, including food and beverages, be "plainly marked . . . at the point where the merchandise is offered for sale."[2]

In a per curiam opinion issued on October 25, 2011, the Appellate Division declared, as a matter of law, that TGIF's failure to list beverage prices on its menus violates the CFA. In rejecting TGIF's argument, the Appellate Division stated: "TGIF engages in legal gymnastics in a futile attempt to convince us that beverages are not embraced within the definition of merchandise in N.J.S.A. 56:8–2.5." At oral argument before this Court, TGIF conceded that it was bound by the Appellate Division's ruling. Because that ruling is the controlling law and is not contested before this Court, TGIF is in violation of the CFA. The only remaining issue is whether the CFA violation—the failure to list

---

[1] At this stage, the allegations in the complaint and evidence of record must be viewed in the light most favorable to plaintiffs, who are seeking class certification. Lee, supra, 203 N.J. at 505, 4 A.3d 561.

[2] The CFA defines "merchandise" as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8–1(c).

beverage prices—caused an ascertainable loss to the class of TGIF patrons.

TGIF does not pretend to be in compliance with the law; rather, its defense is that a class action is not a proper vehicle to be used by the patrons victimized by TGIF's practices. However, a single consumer, even if defrauded, cannot engage in costly litigation over a sum involving, at most, several dollars. Only through a class action that aggregates thousands of small claims of similarly defrauded patrons can a viable lawsuit proceed.

### B.

In support of its application for class certification, plaintiffs rely on marketing studies commissioned by TGIF that analyzed consumer responses to menu pricing.[3] In one study, TGIF tested pricing decisions made by patrons in thirty restaurants—fifteen that listed beverage prices on menus and fifteen that did not. TGIF's statistical study revealed that when alcohol prices are placed on menus, TGIF loses on average $1.72 per customer on a meal. In the study, the informed patrons "traded down" to the optimal price they could afford.

In other studies, TGIF determined the "fair" price and "think-twice" price for the purchase of meals with and without alcoholic beverages. The "think-twice" price, apparently, is the price at which bells go off in patrons' heads and purchases decline because consumers do not want to exceed their "check thresholds." From TGIF's perspective, the beauty of not placing beverage prices on menus in violation of the CFA is that uninformed patrons do not know when their purchases have exceeded the "fair" price and reached the "think-twice" price.

---

[3] TGIF consulted with Simon–Kucher & Partners, a firm that specializes in pricing strategies and refers to itself as "the world's leading pricing consultancy." Pricing, Simon–Kucher & Partners, http://www.simon-kucher.com/en/pricing (last visited Sept. 14, 2017).

TGIF learned through the study what is commonly known—that an informed consumer will make rational pricing decisions. Because restaurants "with alcohol pricing on the menu experienced a [$]1.72 [per-person average] decline as guests traded down," TGIF made the corporate decision that "alcohol pricing will not be placed on the menu."[4] In other words, TGIF determined that it did not pay to conform to the law and that it was more profitable to capitalize on the ignorance of its patrons. From TGIF's own statistical analysis comes the calculation of ascertainable loss to its patrons and the gain to itself.

In passing N.J.S.A. 56:8–2.5 and requiring that the price of an item be "plainly marked," the Legislature intended to empower consumers with knowledge. TGIF has pursued, and continues to pursue, a cynical corporate policy of profiteering from violating that statute.

## II.

The Consumer Fraud Act makes it unlawful for a business to engage in an "unconscionable commercial practice," N.J.S.A. 56:8–2, such as selling merchandise, including food and beverages, without listing the price when it is offered for sale, N.J.S.A. 56:8–2.5.[5] The Act "provides a private cause of action to consumers who are victimized by fraudulent practices in the marketplace." Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 576, 25 A.3d 1103 (2011). The statutory scheme empowers citizens "to act as 'private attorneys general' in bringing civil actions to enforce the Act." Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 361, 142 A.3d 742 (2016). This private right of action is particularly important when

---

[4] The study also included an analysis of non-alcoholic beverage pricing, indicating that customers will trade down when the cost of a meal exceeds a certain threshold.

[5] N.J.S.A. 56:8–2.5 makes it unlawful "for any person to sell ... or offer for sale any merchandise at retail unless the total selling price of such merchandise is plainly marked by a stamp, tag, label or sign either affixed to the merchandise or located at the point where the merchandise is offered for sale."

the Attorney General—perhaps due to inadequate resources—does not exercise his enforcement powers, see N.J.S.A. 56:8–3 to –8, –11, –15 to –18, –20, as here, to compel chain restaurants to comply with price-listing requirements mandated by statute.

A plaintiff must satisfy three elements to prove that a business is liable for consumer fraud. The plaintiff must show that the business engaged in "an unlawful practice," that she suffered an "ascertainable loss," and that the "ascertainable loss" is causally related to the unlawful practice. Gonzalez, supra, 207 N.J. at 576, 25 A.3d 1103 (quoting Lee, supra, 203 N.J. at 521, 4 A.3d 561); see also N.J.S.A. 56:8–19. If the plaintiff succeeds in her proofs, she is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees. N.J.S.A. 56:8–19.

TGIF"s own commissioned study establishes that, on average, TGIF patrons who purchased beverages paid $1.72 more per meal than they would have if prices had been listed on TGIF menus. That $1.72 constitutes, on average, an ascertainable loss per person, per meal, causally related to TGIF"s unlawful practice of not disclosing prices. See Lee, supra, 203 N.J. at 522, 4 A.3d 561; see also N.J.S.A. 56:8–19.[6]

According to the study, TGIF will lose money if it complies with the CFA by listing beverage prices on its menus. If TGIF conforms to the law, then it has two options. It can maintain its current pricing, and informed consumers will trade down rather than purchase drinks that exceed what TGIF has pegged as the "fair" price patrons will pay per meal. Or it can set prices for beverages and meals at rates at which patrons will not trade down. Under either scenario, the consumer benefits if TGIF follows the mandate of the CFA.

---

[6] In plaintiffs' second amended complaint, they allege that TGIF's

practice of offering certain beverages without prices ... is designed to ... enable [TGIF] to charge slightly excessive prices on some drinks without losing sales; facilitate [TGIF's] practice of charging grossly excessive prices on other drinks; and facilitate price discrimination and/or charging different prices for the same product based on undisclosed and arbitrary criteri[a].

Thus, TGIF's patrons who purchase drinks are victimized by the unlawful omission of beverage prices on menus. TGIF sets the overall pricing of its meals and beverages based on its decision not to list beverage prices on menus. Importantly, under the CFA, plaintiffs merely have to show that the unlawful practice caused the ascertainable loss. See Lee, supra, 203 N.J. at 522, 4 A.3d 561; Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., 192 N.J. 372, 389, 929 A.2d 1076 (2007).

## III.

A class action is the only vehicle that will permit the large number of patrons defrauded by TGIF to band together and prosecute a lawsuit on equal terms with TGIF. See Lee, supra, 203 N.J. at 517–18, 4 A.3d 561. The trial court correctly certified the class of customers who purchased unpriced alcoholic and non-alcoholic beverages at company-owned New Jersey TGIF restaurants between January 12, 2004 and July 14, 2014 because the requirements for class certification under Rule 4:32–1 have been met.

Certain issues are not in dispute: the class of TGIF beverage-purchasing consumers is too numerous for joinder of all members, R. 4:32–1(a)(1); "there are questions of law or fact common to the class," R. 4:32–1(a)(2); there are claims and defenses "typical" to the class, R. 4:32–1(a)(3); and the representative party "will fairly and adequately protect the interests of the class," R. 4:32–1(a)(4). The parties disagree, however, on whether "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." See R. 4:32–1(b)(3).

Under our court rule, predominance does not mean that "all issues [must] be identical among class members." Iliadis v. Wal–Mart Stores, Inc., 191 N.J. 88, 108, 922 A.2d 710 (2007). To satisfy the predominance requirement, plaintiffs do not have to show "the absence of individual issues or that the common issues dispose of

the entire dispute." Ibid. Nor is it necessary to show that "each class member [is] affected in precisely the same manner." Id. at 108–09, 922 A.2d 710. Indeed, it is almost certain that individual questions will remain after the resolution of the common questions of law and fact. See id. at 108, 922 A.2d 710. The heart of the matter is whether the common issues are "qualitatively" more significant than the individual ones. See Lee, supra, 203 N.J. at 519–20, 4 A.3d 561.

The common issue of law among all class members is that TGIF does not list its beverage prices in violation of N.J.S.A. 56:8–2.5. The common issue of fact is that all members of the class suffer from TGIF's unlawful practice of not listing beverage prices. The loss suffered by patrons resulting from TGIF's violation of the CFA is dispersed over the entire class of beverage purchasers, with individual patrons incurring greater or lesser losses.

That individual loss determinations must be made is not unusual in class actions. For example, in Lee, supra, the class-action lawsuit alleged that a dietary supplement pill called Relacore was sold to thousands of New Jersey consumers through various mass-marketing deceptions in violation of the CFA. 203 N.J. at 504, 4 A.3d 561. We found that common issues of law and fact predominated, notwithstanding that individual questions concerning each class member's ascertainable loss had to be addressed. Id. at 528, 4 A.3d 561. We recognized that the individual questions would include "[t]he number of bottles of Relacore purchased by a class member, the price of each bottle, and whether a refund was received." Ibid. That information could come from the corporate defendant's records or through a customer's proof of purchase. Ibid. We concluded that "the individual questions posed" did not present an "insuperable obstacle." Ibid.

Similarly, in Iliadis, supra, we addressed the certification of a class of hourly employees of Wal–Mart Stores, Inc. who alleged that they were denied their contractual and statutory right to rest and meal breaks. 191 N.J. at 96, 922 A.2d 710. We held that the predominance prong was met, even though certain individual

questions persisted, including: how much time each employee worked off-the-clock; "whether employees worked off-the-clock with the expectation of compensation; and how much in damages employees suffered." Id. at 112, 922 A.2d 710. The presence of those issues did not defeat the certification of the class because the common issues were qualitatively more significant. Id. at 112–13, 922 A.2d 710.

The individual questions that would remain in this case surely are no more difficult or weighty than those faced in Lee and Iliadis. As was true in those cases, the common issues of law and fact predominate over any individual ones.

In addition, a class action unquestionably is "superior" to any other means of fairly adjudicating the claims against TGIF. The many defrauded patrons will not file actions in small claims court to recover their minor monetary losses. See Lee, supra, 203 N.J. at 528, 4 A.3d 561. As we noted in Lee, "[t]he discovery and litigation costs, including expert-witness fees, make a lawsuit against a determined corporate adversary a costly undertaking." Ibid. A class action "provide[s] a diffuse group of persons, whose claims are too small to litigate individually, the opportunity to engage in collective action and to balance the scales of power." Id. at 528–29, 4 A.3d 561. Moreover, TGIF will not likely reverse its corporate policy of willful disregard of the CFA if just a few patrons seek relief for the small amounts they overpaid. Here, there will be a class action or no action at all.

## IV.

### A.

The statistical evidence establishing that patrons suffer a common ascertainable loss by TGIF's nondisclosure of beverage prices on menus comes from TGIF's own files. The type of statistical evidence offered here is not foreign to our jurisprudence.

In Tyson Foods, Inc. v. Bouaphakeo, the United States Supreme Court approved of the use of a statistical or representative

sample of members of a class of workers, who claimed that they were shorted on their wages, to establish the basis for a class-action lawsuit. 577 U.S. ——, ——, 136 S.Ct. 1036, 1046, 194 L.Ed.2d 124, 134–35 (2016). In that case, employees of Tyson Foods brought a class action under the Fair Labor Standards Act (FLSA), 29 U.S.C.A. §§ 201 to 219, claiming that their employer denied them their rightful overtime wages for the time they expended donning and doffing protective equipment. Id. at ——, 136 S.Ct. at 1041, 194 L.Ed.2d at 129. Tyson Foods contended that the variance in protective gear worn by employees rendered impossible any uniform calculation of time each employee spent putting on and taking off the gear, and therefore "the employees' claims were not sufficiently similar to be resolved on a classwide basis." Id. at ——, 136 S.Ct. at 1042–43, 1046, 194 L.Ed.2d at 131, 134–35.

The Supreme Court disagreed. The Court permitted plaintiffs to rely on expert statistical analysis that determined the average time taken for employees to change into the necessary protective gear. Id. at ——, 136 S.Ct. at 1044–45, 194 L.Ed.2d at 133. Because "each employee worked in the same facility, did similar work, and was paid under the same policy," the experiences of a representative subset of employees was "probative as to the experiences of all of them." Id. at ——, 136 S.Ct. at 1048, 194 L.Ed.2d at 137.

Courts have allowed market research analysis to calculate damages for a class of plaintiffs based on the price premium consumers paid resulting from a company's misrepresentation about its product. One such example in the class action setting is In re Scotts EZ Seed Litigation, 304 F.R.D. 397 (S.D.N.Y. 2015). In that case, consumers in California and New York brought a class action under their respective state consumer laws, alleging that Scotts' description of their grass as "50% thicker with half the water compared to ordinary seed" was misleading. Id. at 404–05 (internal quotations omitted). At the class certification stage, the plaintiffs' expert presented a damages model to specifically isolate the

additional amount of money—or "price premium"—that consumers paid based on the alleged misrepresentation. Id. at 414. The United States District Court held that the proposed model satisfied the standard for showing that damages could be measured on a classwide basis. Id. at 415. Moreover, while the Scotts Court emphasized that under the federal standard an expert was not required to "perform his analyses at the class certification stage," it did point to compelling evidence that had been provided in support of the actual existence of a price premium, including "internal documents suggesting the existence of a premium based on the [allegedly false claim]." Id. at 414. See also Goldemberg v. Johnson & Johnson Consumer Cos., 317 F.R.D. 374, 396–97 (S.D.N.Y. 2016) (holding damages measurable on classwide basis where plaintiffs had presented model that isolates portion of price attributable to company's alleged misrepresentations about its products).

Here, TGIF's internal documents determined the loss attributable to consumers when it did not list beverage prices. The market analysis conducted by the experts in Scotts and Goldemberg are comparable to the market research used by TGIF to justify its not listing beverage prices.

## B.

Based on its marketing studies, TGIF apparently made a business decision not to list beverage prices for the sake of higher profits, notwithstanding that its policy violated the CFA. Certainly, statistical evidence that was sufficiently clear and compelling to guide TGIF in shaping its business policy is equally relevant in this class-action suit to establish that TGIF's unlawful practice caused an ascertainable loss on average of $1.72 per person, per meal.

Plaintiffs have established that common issues of law and fact predominate over individual ones and that a class action is not only a superior vehicle but is the only vehicle for vindicating the rights of the aggrieved class of patrons.

V.

Plaintiffs are not advancing a "fraud-on-the-market" theory—a theory that typically applies in securities cases. Ante at 60, 171 A.3d 620. In an open securities market, the price of stocks depends on all available material information. Peil v. Speiser, 806 F.2d 1154, 1160 (3d Cir. 1986). The fraud-on-the-market theory recognizes that the issuance of a material misleading statement by a company will influence the pricing of its stock. See Basic Inc. v. Levinson, 485 U.S. 224, 241–42, 108 S.Ct. 978, 989, 99 L.Ed.2d 194, 215 (1988). Based on that premise, in a securities-fraud case, stock purchasers can pursue a fraud claim without showing that they relied on the misrepresentations. Ibid. Under the fraud-on-the-market approach, a rebuttable presumption of reliance applies to satisfy the causal requirement between a defendant's misrepresentation and plaintiff's purchase of the stock at the fraudulently inflated price. Id. at 243, 244–47, 108 S.Ct. at 989–92, 99 L.Ed.2d at 216–18. In Kaufman v. i-Stat Corp., we did not allow the plaintiffs in a common-law fraud action to "prove the element of reliance through the presumption of a fraud on the market." 165 N.J. 94, 97, 118, 754 A.2d 1188 (2000) (emphases added).

In this case, plaintiffs do not seek to satisfy an element of their claim through a presumption of fraud on the market. First, "the CFA 'does not require proof of reliance,' but only a causal connection between the unlawful practice and ascertainable loss." See Lee, supra, 203 N.J. at 528, 4 A.3d 561 (quoting Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604, 607, 691 A.2d 350 (1997)). Second, plaintiffs here do not seek the benefit of a presumption to satisfy their burden of proving a causal nexus between TGIF's statutory violation and the ascertainable loss suffered by TGIF's patrons.

The present case is unlike International Union, supra, in which the plaintiff sought "to be relieved of the usual requirements that plaintiff prove an ascertainable loss" by showing only that the price charged for Vioxx was higher than it should have been as a result of defendant's fraudulent marketing campaign." 192 N.J. at

392, 929 A.2d 1076. There, the plaintiff intended to use "a single expert who would opine about the effect on pricing of the marketing campaign in which defendant engaged." Ibid. (emphasis added).

Here, plaintiffs do not rely on a "single expert" to establish the price effect of TGIF's statutory violation. See ibid. Instead, plaintiffs have presented the study commissioned by TGIF that calculates the ascertainable loss to its patrons when beverage prices are not listed on menus. TGIF's own study is offered as direct evidence and, at this procedural stage, is entitled to deference as a statistically accurate calculation of the loss incurred by patrons. Although the evidence must be viewed in the light most favorable to plaintiffs, the majority draws negative inferences to cast doubt on the validity of TGIF's study. Significantly, this case is merely at the class-certification stage, and plaintiffs are entitled to introduce expert-witness testimony to further bolster their claims of ascertainable loss based on TGIF's study.

Moreover, the majority is mistaken if it is suggesting that the CFA does not protect consumers from price gouging. See, e.g., N.J.S.A. 56:8–33(b) (prohibiting ticket scalping at exorbitant rates).[7] The purpose of requiring that the price of merchandise be listed at the point of sale pursuant to N.J.S.A. 56:8–2.5 is to allow consumers to make informed decisions in making purchases. Indeed, the legislative history of N.J.S.A. 56:8–2.5 makes this very point. See Sponsor's Statement to A. 1172 (1972) ("Consumers have a right to know the price of all items they wish to purchase .... Clear indication of the price of all merchandise will aid in

---

[7] N.J.S.A. 56:8–33(b) provides:

No person other than a registered ticket broker shall resell or purchase with the intent to resell a ticket for admission to a place of entertainment at a maximum premium in excess of 20% of the ticket price or $3.00, whichever is greater, plus lawful taxes. No registered ticket broker shall resell or purchase with the intent to resell a ticket for admission to a place of entertainment at a premium in excess of 50% of the price paid to acquire the ticket, plus lawful taxes.

preventing discriminatory sales practices and capricious pricing by merchants.").

Additionally, the greater the number of victims of a CFA violation should not diminish the right to a remedy. The fact that plaintiffs have presented a large discrete class of victimized patrons makes this case a more, not less, compelling case for class certification.

## VI.

I also disagree with the majority's conclusion that plaintiffs have failed to make out a claim under the Truth-in-Consumer Contract, Warranty and Notice Act (TCCWNA), N.J.S.A. 56:12–14 to –18.[8] Plaintiffs have presented evidence to satisfy the four elements of a TCCWNA claim.[9] Plaintiffs have established that (1) they are consumers; (2) TGIF is a seller; (3) TGIF displays menus, which constitute a written notice or sign for purposes of the TCCWNA; and (4) the omission of beverage pricing on the menus violates state law—N.J.S.A. 56:8–2.5. See N.J.S.A. 56:12–15.

The majority contends that plaintiffs are not "aggrieved customer[s]" pursuant to N.J.S.A. 56:12–17, positing that plaintiffs have not met the evidentiary threshold of showing that TGIF patrons were given menus before purchasing their meals. Ante at 69–70, 171 A.3d 620. To reach that conclusion, the majority denies plaintiffs the benefit of the most favorable inferences to be drawn from TGIF's corporate policy of requiring its servers to hand each customer a menu. At this stage, the fair inference is that TGIF's

---

[8] Although the discussion here is directed toward the Dugan case, the reasoning and conclusion apply equally to the Bozzi case.

[9] N.J.S.A. 56:12–15 provides:

No seller ... shall in the course of his business offer to any consumer or prospective consumer ... or display any written ... notice or sign ... which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller ... as established by State or Federal law at the time the offer is made or the consumer contract is signed or ... notice or sign is given or displayed.

servers complied with corporate policy and that patrons received menus. Plaintiffs have satisfied their burden of showing that the class of patrons here meets the definition of aggrieved customers.

Additionally, the majority has erred in finding that TGIF's obligation to display beverage pricing was not clearly established by the CFA's point-of-sale statute, N.J.S.A. 56:8–2.5. Ante at 71–72, 171 A.3d 620. The plain and simple statutory language clearly indicates that TGIF is required to list beverage prices on its menus. N.J.S.A. 56:8–2.5 prohibits the sale of "merchandise" without a price at the point of sale. Merchandise "include[s] any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8–1(c). Clearly, beverages are goods, and at the very least, beverages meet the description of "anything offered ... to the public for sale." Ibid. (emphasis added). TGIF did not have to wait for a published opinion by this Court to reach this common-sense conclusion.

In this case, the Appellate Division expressed its confidence that "if the legislature intended to excise beverage sales at restaurants from the sweep of the CFA ..., it would have done so in plain language without the necessity of an advanced degree in either logic or linguistics." In other words, divining the meaning of "merchandise" is not rocket science. Significantly, no party has argued before us that N.J.S.A. 56:8–2.5 does not mandate that a restaurant list beverage prices on its menus.

Incredibly, the majority hints that N.J.S.A. 56:8–2.5 may not apply to the sale of beverages by restaurants. If that were true, N.J.S.A. 56:8–2.5 would not require restaurants to post any meal prices. Under the statutory definition of merchandise, there is no logical distinction between food and beverage served in restaurants. It cannot be that a hamburger is merchandise but a milkshake is not.

The majority notes that it is unaware of whether the Attorney General has taken action to compel restaurants to list beverage pricing on menus pursuant to N.J.S.A. 56:8–2.5. Ante at 70, 171

A.3d 620. The failure of the Attorney General to enforce a CFA provision, however, is not evidence that a restaurant is complying with the law. Indeed, the CFA vests individuals with the power to act as private attorneys general as a separate enforcement mechanism. Steinberg, supra, 226 N.J. at 361, 142 A.3d 742. This Court, moreover, has the ultimate authority to construe the meaning of N.J.S.A. 56:8–2.5, and if there is any doubt about the Appellate Division's interpretation, the majority should have certified that issue separately. Why has the majority remanded the Bozzi class-certification case for further proceedings if there is a question about whether restaurants must place beverage prices on their menus? Judicial economy certainly is not advanced by letting a class action proceed if there is no statutory authority to support a claim.

Additionally, the majority does not explain why in the Bozzi case it vacated the trial court's injunction, which mandated that OSI restaurants list beverage prices on menus. The right to equitable relief compelling those restaurants to comply with the price-listing requirements of N.J.S.A. 56:8–2.5 was not dependent on class certification. See N.J.S.A. 56:8–19. The right to equitable relief depended only on whether N.J.S.A. 56:8–19 requires disclosure of beverage prices on menus, an issue that the majority refuses to address even though it overturns the trial court's injunction. Last, if the application of TCCWNA to small claims in this case is too blunt an instrument, as argued by amici curiae, the Legislature is the proper forum to address this issue.

## VII.

The majority's decision is a major blow to consumer rights advanced in both the CFA and TCCWNA. The decision ensures that thousands of patrons victimized by TGIF's violation of our consumer-fraud laws have no meaningful remedy. Additionally, TGIF now has little incentive to alter its corporate policy of ignoring provisions of the CFA. TGIF's compliance with N.J.S.A. 56:8–2.5's requirement that beverage prices be listed at the point

of sale may well depend on whether the Attorney General exercises his powers to enforce our consumer-fraud laws.

For the reasons expressed, I respectfully dissent.