**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0853-19

SHARON S. PARK,

     Plaintiff-Respondent,

v.

THE KUKEN, LLC, KEUKEN,
LLC, CHANG KI PARK, a/k/a
MICHAEL PARK, and SAE
JUNG LEE, a/k/a JENNIFER LEE,

     Defendants-Appellants.

_____

Argued November 1, 2021 – Decided January 21, 2022

Before Judges Rothstadt and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-7637-17

Matthew Jeon argued the cause for appellant.

Jason L. Bittiger argued the cause for respondent (Bittiger Elias & Triolo, PC, attorneys; Jason L. Bittiger, of counsel and on the brief).

PER CURIAM

In this Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20, action arising from a proposed home improvement project, defendants The Kuken, LLC, (Kuken), Keuken, LLC (Keuken) (collectively, the corporate defendants), Chang Ki Park (Park), and Sae Jung Lee (Lee), (collectively, the individual defendants), appeal from the Law Division's October 4, 2019 Final Judgment in favor of plaintiff, Sharon Park and against all defendants, awarding damages of $72,569, including treble damages, attorney's fees and costs. On appeal, defendants argue that Judge John D. O'Dwyer erred when he entered an August 14, 2019 order granting partial summary judgment to plaintiff against the corporate defendants on the issue of liability because there was no "meeting of the minds" between the parties and, thus, no contract for home improvement renovations.

Defendants also contend that a different judge, who was scheduled to try the matter, improperly, sua sponte, entered an order in limine on September 19, 2019, which in effect granted plaintiff summary judgment against the individual defendants, after the trial judge found that plaintiff suffered an ascertainable loss under the CFA and that the individual defendants were liable for the corporate defendants' violation of the CFA. According to defendants, these issues required a trial.

We affirm Judge O'Dwyer's order granting plaintiff's partial summary judgment based on the corporate defendants' violations of the CFA. However, we are constrained to vacate the final judgment because the trial judge improperly entered summary judgment as to the issues of ascertainable loss and the individual defendants' liability when he decided those issues in limine without any prior notice to defendants.

I.

A.

The facts leading to the entry of the challenged orders viewed in the light most favorable to defendants are summarized as follows. According to defendants, Park is the president and owner of Kuken. Kuken is a registered home improvement contractor with the State of New Jersey and has a business address in Palisades Park. Lee, Park's wife, is the owner of Keuken, which according to defendants was intended to serve as the design arm of Kuken. Defendants advertised home improvements under the Keuken name, holding Keuken out as a "design/remodeling company" on Park's business card, and advertised all of their services on Keuken's website.

In July 2017, plaintiff was living in Illinois and anticipated moving to New Jersey with her parents. To that end, she and her father purchased a

A-0853-19

condominium unit in Cresskill. Shortly after the closing on the purchase, plaintiff met with Park to discuss hiring him to do work at the unit. Plaintiff had been referred to Park by a relative. Park identified himself to plaintiff as President of Keuken.

After conducting an inspection of the unit, Park recommended the following work: replacement of the hardwood flooring, replacement of the kitchen cabinets, repair of the bathroom vanity, a remodel of the master bathroom, and painting throughout the unit. Plaintiff asked if the work would be completed by November 2017, and Park assured her it would not be an issue. Park encouraged plaintiff to review the Keuken website and visit defendants' showroom to look at sample materials.

On August 10, 2017, plaintiff met with Park and a former employee at the showroom to review sample cabinets, flooring, and paints. During the meeting, Park represented that they were a "'one stop' shop" and could handle all of plaintiff's requested improvements. Park also told plaintiff that they would take care of the renovations if plaintiff gave them a key and that they would provide an estimate to her by the following week, which they failed to do. Two weeks later, plaintiff returned to the showroom to discuss cabinet samples.

A-0853-19

The parties met for a third time, a week after their last meeting, at the showroom during which Park presented plaintiff with an estimate that described the scope of the proposed work and a total cost of $34,380. Although plaintiff later contended that the estimate did not comport with the parties' discussions, plaintiff informed defendants that she wanted to move forward with replacing the cabinet doors in the kitchen and guest bathroom, replacing the flooring throughout the unit with hardwood, and painting the unit's interior.

At the end of the meeting, plaintiff gave Park keys to the unit and, offered to pay a deposit to expedite the process. At Park's direction, plaintiff issued two checks that omitted the payees names: One check, numbered 118, was written for $9,523 for "cabinets[1]" and included "Kuken" in the memo line and the other, numbered 119, was written in the amount of $9,000 to cover the costs of labor and as a deposit for the work to begin. After receiving the checks, and without plaintiff's knowledge, each individual defendant filled in their names: Lee's name as the payee on check number 118, and Park as the payee on check number 119. The individual defendants each deposited the checks in their respective

---

[1] The memo line on check 118 indicates the $9,523 was for "cabinets" and what appears to say "refurb."

personal bank accounts on September 5, 2017. They did so without having entered into a written contract with plaintiff.

Despite the fact that no written agreement existed, a few days after depositing plaintiff's checks, defendants also entered the plaintiff's unit, removed several cabinet doors from the cabinets, and took one of the removed cabinet doors from the unit.

Days later, on September 12, 2017, plaintiff emailed Park requesting a revised estimate for the work and expressing concern with defendants' delay in sending a revised estimate. She also stated that "[i]f the bathroom remodel is going to take several months then I would rather just replace the vanity in that bathroom . . . and just get kitchen cabinets, floors, and paint done." Thereafter, on September 19, 2017, defendants provided plaintiff with a revised estimate on behalf of Keuken (September 19 Estimate). Four days later, the parties met again at the showroom to review plaintiff's proposed amendments to the September 19 Estimate. At the meeting, Park assured plaintiff he would send a revised estimate, omitting mistakes identified by plaintiff, and that the work would be completed by the end of October 2017.

In order to be allowed to have the anticipated work done in her unit, plaintiff had to secure permission from the condominium's homeowner

A-0853-19

association, which plaintiff requested in writing on September 25, 2017. The application plaintiff submitted had already been completed in part by Park. Those portions included details about the contemplated work and identified Keuken as the general contractor for the job. Defendants also indicated on the form that the start date for the job was to be "ASAP," and the completion date was to be approximately "[four] weeks from start." Defendants also provided a certificate of liability insurance for "Kuken, LLC." The next day, the homeowner's association approved the alteration request, whereupon plaintiff informed Park of the acceptance and again requested a finalized revised estimate.

Two days after plaintiff's inquiry, Park emailed plaintiff a revised estimate (September 28 Estimate), on behalf of "Kuken Design & Remodeling Company," and stated that defendants would try to finish the project by the end of October 2017. On September 30, 2017, plaintiff, her mother, and Park had a conference call to discuss certain inaccuracies in the September 28 Estimate, including the exclusion of the costs of paint and primer, despite the fact that the estimate expressly included the costs of materials. At the conclusion of the call, Park informed plaintiff that the inaccuracies would be corrected, that the work

7

would commence by the following week, and that the work would be completed by the end of October. Plaintiff never signed the September 28 Estimate.

Two days after the call, defendants informed plaintiff that they would be unable to complete the flooring work until the end of November. Plaintiff responded that, given the delays, she was inclined to cancel the project and seek a refund of the $18,523 she had paid to defendants. In response, Park informed plaintiff that they had already ordered the requested cabinet doors that would arrive by October 6, 2017 and could be installed by October 11, 2017. Plaintiff responded in an October 2, 2017 email that the proposed timeline for installation of cabinet doors was acceptable, but that she required a refund in the amount of $7,194.70, representing the value of the flooring and painting work that was no longer necessary. She also explained that she would be traveling to New Jersey from Illinois to inspect the completed cabinet work, pick up her refund, and recover her keys on October 12, 2017.

On October 3, 2017, defendants provided plaintiff with a revised estimate on behalf of Kuken, which was still inaccurate according to plaintiff. Plaintiff sent Park several emails regarding the apparent inaccuracies and, on October 4, 2017, requested a revised corrected estimate for the cabinet door work only.

A-0853-19

Defendants responded to plaintiff's email suggesting to plaintiff two different options for moving forward. Under the first, defendants would install the cabinet doors for $1,500, including the cost of the cabinet doors and labor, and would issue plaintiff a refund in the amount of $7,310.83. Under the second option, defendants would deliver the cabinet doors and handles to plaintiff, and plaintiff would make her own arrangements for having them installed. If plaintiff were to have selected this arrangement, defendants represented that $8,810.63 of plaintiff's deposit for labor would be refunded, which represented $9,000 less $189.17 to pay for the cost of the cabinet handles. Defendants' email advised plaintiff that once she selected one of the two options, she could sign a revised estimate and defendants would then notify her of a date for the completion of the work.

In response, plaintiff advised defendants that she would prefer to have defendants install the cabinets and handles provided that defendants could complete the work by October 13, 2017. Plaintiff also requested that defendants include in any revised estimate, a timeframe for completion and specified hours for working at her unit. She also informed defendants that, due to their delays, she would not sign any documents that did "not have [that] level of detail."

9

On October 5, 2017, defendants sent plaintiff yet another revised estimate (October 5 Estimate) on behalf of Kuken that included, among other things, language indicating a "[p]ossibility of delay depending on the manufacturer." Plaintiff emailed defendants with a marked-up, signed copy of the estimate that deleted the caveat to the timetable relating to the manufacturer. Defendants did not respond that day. The next day, plaintiff emailed Park requesting defendants send her a countersigned copy of the revised October 5 Estimate and confirm the dates for completion of work. Defendants never signed the revised estimate, nor did they return plaintiff's money, keys, or cabinet door.

When defendants refused to countersign the revised October 5 Estimate, on October 12, 2017, plaintiff's attorney sent defendants a letter demanding a refund of the $18,523 plaintiff paid and a return of all personal property removed from her unit, including the keys and a kitchen cabinet door. Defendants responded, stating that they had been advised by their attorney to limit contact with plaintiff and to "not release any and all items" they had received from her.

Plaintiff then changed the locks to her unit and ultimately contracted with Home Depot to replace the kitchen cabinet doors at a cost of $12,231. She also hired another contractor to replace the flooring at a cost of $13,609.63.

10

B.

On November 8, 2017, plaintiff filed a nine-count complaint against the individual defendants and Kuken. Thereafter, on February 2, 2018, plaintiff filed an amended complaint naming Keuken as an additional defendant and asserting only two counts in place of the original nine: a cause of action under the CFA and a claim for breach of contract against all defendants. Defendants filed an answer to the first amended complaint with a counterclaim for quantum meruit and for a declaratory judgment that no contract existed between the parties.

On July 5, 2019, plaintiff filed a motion for partial summary judgment, as to the first count in her amended complaint alleging violations of the CFA and as to defendants' counterclaims for quantum meruit and declaratory judgment. On August 14, 2019, Judge O'Dwyer granted plaintiff's motion in part and entered partial summary judgment in plaintiff's favor against the corporate defendants on the first count of plaintiff's amended complaint. According to the judge's twelve-page written decision, he found that after the July 17, 2017 meeting, the parties agreed to the essential terms of the work to be performed but that agreement was never reduced to a written agreement before defendants accepted money from the plaintiff or entered her unit to begin work. Under

11

those circumstances, the judge concluded that the corporate defendants' actions were per se violations of the CFA because those defendants failed to comply with the Contractors' Registration Act (CRA), N.J.S.A. 56:8-136 to –152,[2] and the relevant regulations, Home Improvement Practice, N.J.A.C. 13:45A-16.1 to -16.2 and Home Improvement Contractor Registration, N.J.A.C. 13:45A-17.1 to -17.14, promulgated thereunder, which renders any violation an unlawful practice under the CFA. The judge did not address whether plaintiff established an ascertainable loss but concluded the "quantum of damages" owed plaintiff, and the individual defendants' liability were to be determined at trial. The judge also denied, without prejudice, plaintiff's motion for summary judgment as to defendants' counterclaim.

On September 18, 2019, the day before the scheduled trial date, plaintiff filed a motion in limine seeking "an Order barring the introduction of any evidence during [t]rial by [d]efendants in support of [d]efendants' [c]ounterclaim for [q]uantum [m]eruit due to [d]efendants' willful and deliberate failure to provide any discovery in support of that claim." She did not seek summary judgment as to any other issues that Judge O'Dwyer left for trial.

---

[2] Of particular importance to this case, failure to comply with the CRA's provisions and implementing regulations also constitutes a violation of the CFA. N.J.S.A. 56:8-146(a).

The next day, the trial judge first dismissed defendants' counterclaim seeking a declaratory judgment that the parties had not entered into any contract for renovations of the unit. He explained that Judge O'Dwyer had previously denied plaintiff's motion to dismiss the counterclaim without prejudice but nevertheless, based on Judge O'Dwyer's finding that a contract existed, albeit not written, the trial judge dismissed defendants' counterclaim for declaratory judgment with prejudice.

The judge then granted plaintiff's motion in limine prohibiting defendants from introducing evidence at trial in support of their counterclaim for quantum meruit. He explained that any counterclaim for quantum meruit in a consumer fraud action must be supported by evidence indicating a reasonable value of services performed. The judge found that, despite having an obligation to produce such evidence in discovery, defendants had not produced any evidence of services performed or the reasonable value of any services performed. He also noted that although Park had stated at his deposition that he had documents evidencing an amount paid for cabinets, Park had explicitly refused to produce them. Accordingly, the judge granted plaintiff's motion in limine and, as a consequence, dismissed defendants' quantum meruit claim with prejudice for lack of "evidence that can go before any fact finder . . . to support such a claim."

13

As defendants had no quantum meruit claim to offset the loss plaintiff accrued by virtue of defendants' violation of the CFA, the judge then sua sponte entered judgment against the corporate defendants, finding $18,523 as plaintiff's ascertainable loss caused by the corporate defendants' violation of the CFA.

Although plaintiff's motion in limine did not seek further relief, the trial judge then determined that the uncontroverted facts before him demonstrated that the individual defendants' participation in the corporate defendants' violation of the CFA was sufficient to hold them each liable under the CFA. As to Park, the judge explained that he "participated in this relationship with the plaintiff from the beginning, had countless dealings with her, and was the primary source of information in reaching whatever end point was reached under these negotiations or arrangements up until the plaintiff asked for the return of the money." As to Lee, he found that she had participated to a lesser extent than Park but, like Park, had nonetheless taken money given by plaintiff, deposited it into her personal account, and did not return plaintiff's funds upon her request.

Accordingly, based on the evidence in the record as to the corporate defendants' conduct violating the CFA, the loss sustained by plaintiff at the time of and as a result of that violation, and the individual defendants' participation in the conduct constituting the violation was uncontroverted, the trial judge

14

determined there were no factual issues to be determined at trial and entered final judgment in plaintiff's favor against all defendants. In doing so, the judge found that plaintiff's damage award in the amount of her deposit, $18,523, was to be trebled under the CFA. He also requested that plaintiff's counsel submit a certification detailing plaintiff's reasonable counsel fees for an award of attorney's fees as well. In light of the judge's ruling, plaintiff agreed to voluntarily dismiss her remaining claim for breach of contract without prejudice.

On October 4, 2019, the trial judge entered the final judgment, awarding plaintiff $72,569. Shortly thereafter, on October 23, 2019, plaintiff filed a motion to amend the attorney's fees award established in the final judgment and sought a writ of execution to enforce the final judgment.[3] This appeal followed.

II.

We begin our review by addressing defendants' challenge to Judge O'Dwyer's order granting partial summary judgment.[4] Defendants argue that the

---

[3] On December 6, 2019, the trial judge granted plaintiff's motion to amend the judgment pursuant to Rule 4:49-2, increasing the amount of the judgment to $76,194 to reflect the award of treble damages, counsel fees, and costs, plus prejudgment interest in accordance with Rule 4:58-2(b).

[4] We note that defendants' Notice of Appeal only identifies the final judgment as the only challenged order or judgment. Campagna ex rel. Greco v. Am. Cyanamid Co., 337 N.J. Super. 530, 550 (App. Div. 2001) (refusing to consider

A-0853-19

judge erred in determining that the corporate defendants had violated the CFA because he erroneously concluded there was a "meeting of the minds" between the parties on the essential terms of a purported contract. They contend that because entry of summary judgment in plaintiff's favor was premised upon the assumption that the parties had failed to memorialize their contract in a signed, written document, Judge O'Dwyer's order must be vacated as no contract existed between the parties to be memorialized in the first place.

To this end, defendants cite to the parties' various communications sent between September 12 and October 6, 2017, in which the parties discussed changing the scope of the desired work, shifting deadlines, and exchanged revised estimates numerous times, to argue that no meeting of the minds occurred, as the parties "failed to reach an agreement on one of the most essential terms of the contract . . . the deadline to complete the project."

order not listed in notice of appeal). Generally, we will not consider challenges to orders not identified in the Notice of Appeal. However, their Case Information Statement identifies Judge O'Dwyer's order as well, and the parties have briefed the issues arising from defendants' challenge to it. For that reason, we consider both orders properly before us. See Silviera-Francisco v. Bd. of Educ. of City of Elizabeth, 224 N.J. 126, 142 (2016) (stating an order "clearly identified [in a] Case Information Statement submitted with [a] Notice of Appeal" is deemed properly before the court for review).

We conclude defendants' argument is without any merit because the contention is belied by the parties' undisputed conduct, especially defendants' refusal to return plaintiff's money, keys, or cabinet door.

A.

We review a trial court's grant of summary judgment de novo, "applying the same standard as the trial court." State v. Anderson, 248 N.J. 53, 67 (2021) (quoting Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 511 (2019)). "By that standard, summary judgment should be granted 'when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to judgment or order as a matter of law.'"" Woytas, 237 N.J. at 511 (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995)). In doing so, we consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014) (quoting Brill, 142 N.J. at 540). If "the evidence 'is so one-sided that one party must prevail as a

matter of law,'" summary judgment is appropriate.  Ibid. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 259 (1986)).

B.

With those guiding principles in mind, we turn to the CFA and a home improvement contractor's obligation under the CRA and its related regulations. The CFA defines a violation as the following:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.
>
> [N.J.S.A. 56:8-2.]

Courts interpreting this language have divided unlawful practices "for analytical purposes, into three categories."  Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 556 (2009) (citing Cox v. Sears Roebuck & Co., 138 N.J. 2, 17 (1994)).  Unlawful practices can be "affirmative acts, claims asserting knowing omissions, and claims based on regulatory violations."  Ibid.  See also Dugan v. TGI Fridays, Inc., 231 N.J. 24, 51 (2017).  Moreover, "the [CFA] makes no

18

distinction between 'technical' violations and more 'substantive' ones." BJM

Insulation & Constr. v. Evans, 287 N.J. Super. 513, 518 (App. Div. 1996).

Where the alleged unlawful practice is based upon a regulatory violation,
"[a] showing of intent is not essential," Dugan, 231 N.J. at 51, and "the
regulations impose strict liability for such violations," Cox, 138 N.J. at 18.
Similarly, where the unlawful practice is based upon an affirmative act, a
showing of intent is not essential to the success of plaintiff's claim. Dugan, 231
N.J. at 51. Rather, in the area of home improvement contracts, the CFA's "focus
is to compel those who sell consumer goods and services to the public to develop
practices that will minimize consumer fraud. Foremost among such practices is
the requirement of written agreements." Marascio v. Campanella, 298 N.J.
Super. 491, 501 (App. Div. 1997) (applying the CFA to a contract for electrical
work and services specific to the premises in question).

Enacted in 2004 as an amendment to the CFA, the CRA and the relevant
regulations[5] promulgated thereunder outline several statutory criteria home
improvement contractors are required to comply with in order to do business in
New Jersey. N.J.S.A. 56:8-136. Importantly, the CRA expressly provides that

---

[5] See N.J.A.C. 13:45A-16.1 to -16.2, as to home improvement practices, and
N.J.A.C. 13:45A-17.1 to -17.14 as to home improvement contractor registration.

any violation of any provision of the CRA is an "unlawful practice" within the meaning of the CFA. N.J.S.A. 56:8-146.

The CRA defines a "[c]ontractor" as "a person engaged in the business of making or selling home improvements and includes a corporation, partnership, association and any other form of business organization or entity, and its officers, representatives, agents and employees." N.J.S.A. 56:8-137; N.J.A.C. 13:45A-17.2. The statute also defines a "[h]ome improvement contract" as any "oral or written agreement for the performance of a home improvement between a contractor and an owner . . . of a residential or noncommercial property, and includes all agreements under which the contractor is to perform labor or render services for home improvements, or furnish materials in connection therewith." N.J.S.A. 56:8-137; N.J.A.C. 13:45A-17.2.

The CRA expressly provides several limitations on contractors' operations, including the form and procedure for contractors' contracts, advertising materials, and business documents. N.J.S.A. 56:8-151. It also requires that every registered contractor engaged in home improvement in New Jersey must maintain a commercial general liability insurance policy and to file proof with the director. N.J.S.A. 56:8-142; N.J.A.C. 13:45A-17.12.

As to home improvement contracts, the CRA requires that

A-0853-19

every home improvement contract for a purchase price in excess of $500, and all changes in the terms and conditions of the contract, <u>shall be in writing</u>. The contract shall be <u>signed by all parties thereto</u>, and shall clearly and accurately set forth in legible form and in understandable language all terms and conditions of the contract, including but not limited to:

(1) The legal name, business address, and registration number of the contractor;

(2) A copy of the certificate of commercial general liability insurance required of a contractor pursuant to section 7 of this act and the telephone number of the insurance company issuing the certificate; and

(3) The total price or other consideration to be paid by the owner, including the finance charges.

[N.J.S.A. 56:8-151(a) (emphasis added) (footnote omitted); <u>see also</u> N.J.A.C. 13:45A-16.2.]

The CRA also outlines specific requirements for informing consumers of their cancellation rights under home improvement contracts. N.J.S.A. 56:8-151(b) provides that "a home improvement contract may be cancelled by a consumer for any reason at any time before midnight of the third business day after the consumer receives a copy of it," and that home improvement contracts include notice of the right to rescind in conspicuous language, "in at least 10-point bold-faced type." <u>Ibid.</u> In the event a consumer cancels a contract, "[a]ll

21

moneys paid pursuant to the cancelled contract shall be fully refunded within 30 days of receipt of the notice of cancellation." Ibid.

The CRA also requires home improvement contractors to register with the Division of Consumer Affairs, N.J.S.A. 56:8-138; N.J.A.C. 13:45A-17.3, and to "prominently display their registration number within their places of business, in all advertisements . . ., on business documents, contracts and correspondence with consumers," N.J.S.A. 56:8-144(a). Contractors are also required to include in "[a]ny invoice, contract or correspondence," N.J.S.A. 56:8-144(b), a toll-free telephone number for "consumers making inquiries regarding contractors," N.J.S.A. 56:8-149(b). Defendants here failed to comply with many of these requirements starting with the requirement that any agreement be in writing and signed by the parties.

Contrary to defendants' arguments on appeal, Judge O'Dwyer properly found defendants had failed to enter into a written contract before accepting plaintiff's deposit or beginning work for which they sought compensation, and therefore properly found defendants had violated the CRA. According to the judge, that finding did not mean there was no contract. Quoting from Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992), Judge O'Dwyer stated that a contract exists where the "parties agree on essential terms and manifest an

intention to be bound by those terms." He concluded that the parties had agreed on the necessary essential terms, because it was "undisputed that . . . [d]efendants accepted over $18,000 in funds from [p]laintiff, deposited same into their individual accounts, ordered cabinets, and sought entry to the premises to commence work." We agree.

"A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" Ibid. (quoting West Caldwell v. Caldwell, 26 N.J. 9, 24-25 (1958)). "As a general principle of contract law, there must be a meeting of the minds for an agreement to exist." Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 319 (2019) (citing Johnson & Johnson v. Charmley Drug Co., 11 N.J. 526, 538 (1953)). In addition, the parties must agree "to the essential terms" of the agreement. Cumberland Farms, Inc. v. N.J. Dep't of Env't Prot., 447 N.J. Super. 423, 438-39 (App. Div. 2016) (quoting Mosley v. Femina Fashions, Inc., 356 N.J. Super. 118, 126 (App. Div. 2002)). Essential terms are those that go to the "heart of the alleged agreement." Satellite Ent. Ctr., Inc. v. Keaton, 347 N.J. Super. 268, 277 (App. Div. 2002). "Where the parties do not agree to one or more essential terms, however, courts generally hold that the agreement is unenforceable." Weichert, 128 N.J. at 435.

A-0853-19

Among their arguments to the contrary, defendants contend that Judge O'Dwyer erred in finding that the parties had a contract, as they had failed to come to "an agreement on one of the most essential terms of the contract . . . the deadline to complete the project." This assertion is belied by the record, which demonstrates that Park met with plaintiff at the unit to discuss the project on July 29, 2017, and that, during that meeting, plaintiff and Park agreed that the renovations would be completed by November 2017. Moreover, as of the conclusion of the parties' September 1, 2017 meeting at defendants' showroom, the record demonstrates that the parties had negotiated the scope of the work to be performed, a November 2017 deadline for the completion of the work, a total price of $34,380 for the project as a whole, and defendants accepted $18,523 as a deposit to commence performance. Accordingly, the record demonstrates that there was a "meeting of the minds" as to all essential terms of the contract and that, as a consequence, defendants were in violation of the CRA in declining to reduce that agreement to writing before accepting payment and beginning work. Kernahan, 236 N.J. at 319.

Nevertheless, as noted by Judge O'Dwyer, even disregarding that deficiency, defendants were still in violation of the CRA as none of their business documents or numerous communications with plaintiff included the

required home improvement contractor registration number required by N.J.S.A. 56:8-144(a) or the toll-free telephone number required on any "invoice, contract or correspondence" with a consumer by N.J.S.A. 56:8-144(b) and N.J.S.A. 56:8-149.

Each of defendants' CRA violations are expressly made "unlawful practices" by the clear terms of the CRA. N.J.S.A. 56:8-146. Accordingly, Judge O'Dwyer did not err in finding that the corporate defendants committed an unlawful practice within the meaning of the CFA by virtue of their violations of the plain language requirements for home improvement contractors under the CRA.

Even if those CRA violations were not sufficient to give rise to an unlawful practice under the CFA, we conclude from our de novo review that defendants' conduct throughout the transaction gave rise to other prohibited practices. Although not addressed by Judge O'Dwyer, in response to plaintiff's motion for summary judgment, plaintiff argued that defendants should be held liable under the CFA because, in addition to violating the clear language of the CRA in several respects, defendants' dealings with plaintiff constituted "unconscionable commercial practice[s]" for the purposes of finding an unlawful practice under the CFA. N.J.S.A. 56:8-2. We agree and affirm Judge

O'Dwyer's order for those reasons as well. See Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001) (appeals are taken from orders and judgments, not opinions or oral decisions); Triffin v. SHS Grp., LLC, 466 N.J. Super. 460, 463-64 (App. Div. 2021) (affirming a trial judge's conclusions for reasons different than that of the trial judge).

"There is no precise formulation for an 'unconscionable' act that satisfies the statutory standard for an unlawful practice. The statute establishes 'a broad business ethic' applied 'to balance the interests of the consumer public and those of the sellers.'" D'Agostino v. Maldonado, 216 N.J. 168, 184 (2013) (quoting Kugler v. Romain, 58 N.J. 522, 543-44 (1971)). However, "[a]n unconscionable practice under the CFA 'necessarily entails a lack of good faith, fair dealing, and honesty.'" Id. at 189 (quoting Van Holt v. Liberty Mut. Fire Ins. Co., 163 F.3d 161, 168 (3d Cir. 1998)). In construing the CFA, courts are to interpret unconscionability "liberally" in favor of consumers "so as to effectuate the public purpose" of the act and must evaluate whether a defendant's conduct rises to the level of unconscionability on "a case-by-case basis." Kugler, 58 N.J. 543. And, as noted above, "intent is not a required element" where an affirmative act proscribed by the CFA has occurred; such an act "may be established by showing

A-0853-19

that a defendant's actions constituted one of the stated prohibited practices." Thiedemann v. Mercedez-Benz USA, LLC, 183 N.J. 234, 245 (2005).

The undisputed facts in the record demonstrate that defendants accepted $18,523 from plaintiff without memorializing their agreement in a signed, written contract; a course of conduct made less palatable when considering defendants' repeated argument throughout this litigation that no contract existed between the parties at the time. If that were true, defendants had no basis to argue that their refusal to return plaintiff's money, keys, and cabinet door was in any way justified.

The record further demonstrates that is undisputed that the individual defendants deposited plaintiff's funds into their personal bank accounts with the express intent, according to Park, to avoid taxes that might be incurred if the funds were deposited into the corporate defendants' accounts. It is similarly undisputed that defendants then refused to provide plaintiff with a refund upon her request, despite the fact that defendants had not performed any work on the property over the course of the previous months aside from removing a cabinet door, and despite that plaintiff was entitled to a refund until three days after the signing of a written contract per the cancellation language required on—albeit

absent from—any agreement sent to plaintiff by defendants. See N.J.S.A. 56:8-151(b).

The undisputed facts in the record similarly demonstrate that defendants misrepresented which corporate defendant plaintiff would be dealing with regarding the work, as early estimates were sent on behalf of Keuken—a company that was uninsured and not a registered home improvement contractor—and the promotional materials provided to plaintiff during her discussions with Park represented that he was president of Keuken, not Kuken. The record also demonstrates that defendants repeatedly failed to provide plaintiff with a certificate of commercial general liability insurance despite their obligation to provide one under all home improvement contracts under N.J.S.A. 56:8-142, and that, when they did eventually provide a certificate, they attempted to charge plaintiff $500 for same.

For the foregoing reasons, the uncontroverted facts in the record demonstrate that defendants' business practices throughout their dealings with plaintiff fail to meet acceptable standards of "good faith, fair dealing, and honesty" expected under the CFA and constituted unlawful acts within the meaning of the CFA. N.J.S.A. 56:8-2.

A-0853-19

C.

As already noted, Judge O'Dwyer denied plaintiff's summary judgment as to the remaining elements of her CFA claims and as to the issue of the individual defendants' liability for the corporate defendants' CFA violations. The additional elements of a CFA claim required plaintiff to prove at trial that she suffered an "'an ascertainable loss by plaintiff' and 'a causal relationship between the unlawful conduct and the ascertainable loss.'" Dugan, 231 N.J. at 52 (quoting D'Agostino, 216 N.J. at 184).

In order to impose individual liability, plaintiff had to prove the employee or corporate officer had personally "engaged in conduct prohibited by the CFA." Allen v. V&A Bros., Inc., 208 N.J. 114, 132 (2011). The individual's own affirmative acts or knowing omissions must have been part of the violation. Id. at 130-33 (citing N.J.S.A. 56:8-2).

Here, the record indicates, and as plaintiff's counsel confirmed before us at oral argument, plaintiff never sought summary judgment before the trial judge on those remaining issues. The record here therefore convinces us that the trial judge improperly used plaintiff's motion in limine, which only addressed defendants' lack of documents to establish any offset or relief under their counterclaim, to short cut the process by avoiding trial and sua sponte granting

29

summary judgment as to these remaining issues, without any advance notice to defendants.

The procedure followed by the trial judge here cannot be sustained. As we stated in Seoung Ouk Cho v. Trinitas Regional Medical Center, 443 N.J. Super. 461, 475 (App. Div. 2015), "absent extraordinary circumstances or the opposing party's consent, the consideration of an untimely summary judgment motion [when one is filed] at trial and resulting dismissal of a complaint deprives a plaintiff of due process of law.[6]" This is especially true where, as here, not only was the opposing party not put on notice that such relief may be awarded by the trial judge, but the awarding of that relief was a surprise to all parties and only the result of the trial judge's sua sponte actions. At a minimum, the procedure followed by the trial judge was simply unfair.

Under these circumstances we are constrained to vacate the final judgment and remand for further proceedings before a different judge. See Graziano v. Grant, 326 N.J. Super. 328, 349-50 (App. Div. 1999) (explaining our authority

---

[6] Cho's bar against dispositive summary judgment motions being decided in limine has been incorporated into our Court Rules, effective September 1, 2020. See R. 4:25-28 ("a motion in limine is defined as an application returnable at trial for a ruling regarding the conduct of the trial, including admissibility of evidence, which motion, if granted, would not have a dispositive impact on a litigant's case").

A-0853-19

to do so when it is necessary where "there is a concern that the trial judge has a potential commitment to his or her prior findings"); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 4 on R. 1:12-1 (2021) (remand to a different judge is appropriate "to preserve the appearance of a fair and unprejudiced hearing").

By vacating the final judgment, we do not disturb Judge O'Dwyer's order or the trial judge's order as to the dismissal of defendants' counterclaim as it was entered after plaintiff filed her motion on notice to defendants. Moreover, the reasons for those orders are unassailable in light of defendants' conduct both in the underlying transaction and in the course of the litigation. It is only the determinations made by the trial judge about plaintiff's proving an ascertainable, causally related loss and the individual defendants' liability that shall be the subject of the remand, which may be completed through the determination of a properly filed summary judgment motion or by trial. Whichever way the matter is resolved, by our remand, we are not suggesting any specific outcome.

The parties shall conduct a case management conference within thirty days to schedule another round of summary judgment motions as to the remaining issues if any of them choose to file such motions. If not, or if filed and unsuccessful, the matter shall be relisted for trial as to the remaining issues.

Affirmed in part; vacated and remanded in part for further proceedings consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION